**UNITED STATES v. PARK MOTORS, Inc. et al.**

No. 1851.

United States District Court
E. D. Tennessee, Northern Division.

July 25, 1952.

Supplemental Opinion Aug. 6, 1952.

Otto Ault, U. S. Dist. Atty., Chattanooga, Tenn., Ferdinand Powell, Jr., Asst. U. S. Dist. Atty., Knoxville, Tenn., for plaintiff.

Anderson & Anderson, Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

This is an action to recover a civil penalty of $2,000 in each of four counts, together with double damages and costs, for alleged violations of the False Claims Statute, 31 U.S.C.A. § 231, in connection with the sale of four automobiles to as many disabled veterans and claim for reimbursement from the Veterans Administration, as provided by Public Law 663, 79th Congress, approved August 8, 1946, 60 Stat. 910.

There were four transactions, substantially alike, a statement of one being sufficient to fix the approximate time and character of all.

On or about November 5, 1946, one of the veterans applied to the Veterans Administration for, and was granted, a certificate to the effect that he was eligible to purchase an automobile at Government expense, as provided in Public Law 663, wherein the maximum cost is fixed at $1,600. He presented the certificate to the defendants and entered into a purchase-order contract with them for the purchase of an automobile. The price stated in the contract was $1,595.49. Also contained in the contract was a provision that in the event of a change in the retail price of the vehicle before delivery, the purchaser would pay the new price or permit the defendants to cancel the contract. This contract, entered into about November 5, 1946, was submitted to the Veterans Administration and was approved by the Finance Officer on November 13, 1946.

In the meantime, on November 11, 1946, by authority of the Office of Price Administration, the retail price of the ordered automobile was increased in the amount of $105, and the defendants were thereafter notified of the increase. On or before February 6, 1947, defendants informed the purchaser that under the terms of the contract he would have to pay the additional $105 in order to get the automobile. The purchaser agreed to and did pay to defendants the additional $105 and signed a certificate as follows: "I hereby acknowledge receipt of the automobile identified below and certify that the total purchase price, including special attachments and devices listed above required to operate the vehicle safely and any tax which is reflected in the purchase price, does not exceed $1,600.00." Underneath the purchaser's certificate was the certificate of the seller, as follows: "I certify that the above bill is correct and just; that payment therefor has not been received." This was signed: "Park Motors, Inc., by John D. Black, Pres." The bill referred to was in the amount of $1,595.49.

There is a further allegation in the complaint that the transaction involved purchase by the veteran from defendants of certain other items, admitted by defendants to have been a radio and some anti-

freeze, neither of which was included in either the claim submitted to the Veterans Administration or the contract of purchase of the automobile, but each item was separately contracted for and installed either before or at about the time of delivery of the automobile to the purchaser.

Exclusive of the accessories, the automobile, including the $105, representing the increase in retail price, cost the total of $1,700.49. It is upon this fact of total cost, coupled with the claim for a lesser amount, that the Government bases its case against defendants. The proof shows, however, that before continuing with the transaction after learning of the price increase, defendant Black called the Nashville office of the Veterans Administration and was told over the telephone by some individual in that office that in the judgment of that office he saw no objection to the defendants collecting $105 from the veteran, but that the invoice had to agree with the contract and that the Veterans Administration would not pay over $1,600. No ground exists for a finding that the Government was overcharged, or that the sum of $1,595.49 contained any element of fiction, or that upon being paid the $1,595.49 by the Government the defendants received something which, as a business transaction, they were not entitled to, or that with fraudulent design they undertook to deceive and cheat the Government. On the contrary, the evidence shows that defendants acted in good faith, with honest purpose, and in the belief that they were proceeding with Government approval. In a practical sense, neither the purchaser nor the Government was cheated.

Prior to the increase in the retail price, the Government had approved the contract figure of $1,595.49. Increase by the manufacturer of the retail price to the extent of $105 added nothing to and took nothing away from the automobile. There is no affirmative showing that the increase of the price conferred any benefit upon the defendants. In ordinary reason, if the defendants were entitled to receive $1,595.49 from the Government before the increase, they were still entitled to receive that sum. Nevertheless, for the reason that $1,595.49 was not the entire cost of the automobile, it is insisted by the Government that defendants knowingly and wilfully presented a false claim which the Government paid, but which the Government would not have paid had it known all of the pertinent facts.

Defendants take the position that regulations purporting to exclude separate contracts for accessories lacked statutory and constitutional support, that performance of the sale contract and submission of the claim had Government approval, and that the claim submitted was not false and contained no fraudulent representation. On behalf of defendants it is also urged, and in the Court's opinion proved, that defendants had no specific intent to defraud or deceive the Government, but acted throughout openly and with honest intent.

As against the stated defenses, it is the Government's insistence that the claim was false because it did not state the true cost of the automobile, that defendants knew of its falsity in that respect, that in that knowledge they wilfully presented the claim for payment and in due course received payment thereon, and that in that situation the law implied fraudulent intent, if such intent is material.

Sec. 231 of Title 31 U.S.C.A., provides as follows:

"Any person * * * who shall make or cause to be made, or present or cause to be presented, for payment or approval, * * * any claim * * * knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit * * *."

As evidence of his receipt of the automobile, the purchaser signed a statement in the following words:

"I hereby acknowledge receipt of the automobile identified below and certify that the total purchase price, including special attachments and devices listed above required to operate the vehicle safely and any tax which is reflected in the purchase price, does not exceed $1,600.00.

"Section V—Receipt for Automobile.

"Make, Olds; Model, 66; Year, 1947; Motor No. 6–90898–H; Purchase price, $1,595.49; Date of sale, 11–15–46.

"Special attachments required to operate the vehicle: Hydra-Matic Drive.

"Name and Address of Seller: Park Motors, Inc., 900 S. Gay St., Knoxville, Tenn.

"Date of Delivery, Feb. 6, 1947.

"Signature of Veteran: Victor H. Huckeby."

Below the signature of the veteran appears the following:

"I certify that the above bill is correct and just; that payment therefor has not been received."

This is signed: "Park Motors, Inc., By John D. Black, Pres."

As the date of delivery of the automobile was February 6, 1947, the date of the receipt acknowledging delivery presumably would be the same or a subsequent date. At the top of the statement and appearing as the first item below the letter heading is the following: "Knoxville, Tenn., February 6, 1947." This date should, and does, fix the date of both certificates as February 6, 1947. On that or a prior date the purchaser paid the additional $105 heretofore mentioned as the retail price increase. The purchaser's statement that the total purchase price did not exceed $1,600 was, therefore, not true as of that date. Although the statement fixes the date of sale as November 15, 1946, and as of that date there had been no payment of the $105, this does not change the fact that at the date of the certificate the purchaser had paid, or contracted to pay, a total of $1,700.49. By certifying below the signature of the purchaser that the "above bill is correct," the seller adopted the purchaser's statement by reference, thus making the incorrect statement of the purchaser that of the seller also. Inasmuch as the seller, that is the defendants, knew all of the facts, there is no escaping the conclusion that the seller knew of the incorrectness of the statement and presented it to the Government, knowing that it did not reflect the "total purchase price."

From this finding that defendants knew the statement did not reflect the total purchase price, does it follow that defendants presented a claim upon the Government, knowing such claim to be false, fictitious or fraudulent? That defendant Black was told by some person in the Nashville office of the Veterans Administration that it would be proper for him to collect $105 from the purchaser and the originally contracted amount from the Government, would seem to be material only as to defendant's good faith and absence of intent to cheat the Government; it does not alter the fact that the claim presented to the Government contained an untrue statement. Nor does it remove the certainty that defendant knew the statement to contain an untruth. But was it untrue in the sense of being false, fictitious or fraudulent?

In support of an affirmative answer, the Government relates the statement to Public Law 663 and the Regulations promulgated thereunder and would show that defendants not only presented a false claim but also violated the law as embodied in the aforesaid Regulations, thereby supplying substance to the form of falsity. Public Law 663, approved August 8, 1946, provides as follows:

"*Automobiles and other conveyances for disabled veterans:* To enable the Administrator of Veterans' Affairs to provide an automobile or other conveyance, at a cost per vehicle or conveyance of not to exceed $1,600, including equipment with such special attachments and devices as the Administrator may deem necessary, for each veteran

of World War II who is entitled to compensation for the loss, or loss of use, of one or both legs at or above the ankle under the laws administered by the Veterans' Administration, $30,000,000: Provided, That no part of the money appropriated by this paragraph shall be used for the repair, maintenance, or replacement of any such automobile or other conveyance and no veteran shall be given an automobile or other conveyance under the provisions of this paragraph until it is established to the satisfaction of the Administrator that such veteran will be able to operate such automobile or other conveyance in a manner consistent with his own safety and the safety of others and will be licensed to operate such automobile or other conveyance by the State of his residence or other proper licensing authority: Provided further, That under such regulations as the Administrator may prescribe the furnishing of such automobile or other conveyance shall be accomplished by the Administrator paying the total purchase price to the seller from whom the veteran is purchasing under sales agreement between the seller and the veteran."

From a reading of the foregoing, certain points stand out as indications of the legislative intent:

1. That the Government undertook to give to each veteran who qualified for the same an automobile or other vehicle as additional compensation for the loss of one, or both legs;

2. That the Government would make the gift effective by paying directly to the seller the cost of the vehicle;

3. That inasmuch as the automobile was intended as a gift to the veteran, the maximum cost of $1,600.00 meant cost to the Government, not cost to the veteran;

4. That the gratuity could take only one form, namely, an automobile or some other kind of conveyance, and could not take the form of repair, maintenance or replacement; and

5. That the gratuity should not take the form of money in the hands of the veteran with which to purchase an automobile, but should be an automobile for which the Government would make payment of the purchase price directly to the seller.

In addition to the foregoing, Public Law 663 required that a veteran who would take advantage of the gratuity establish to the satisfaction of the Administrator that he would be able to operate a vehicle safely and that he would be licensed to operate it.

From the foregoing analysis of Public Law 663, particularly the third point, the nature of what defendants did becomes clearer. The listed purchase price of $1,595.49 is revealed as the stated cost to the Government. This was the price originally approved by the Finance Officer. Increase in the retail price did not add to the approved cost to the Government. Had there been a decrease instead of an increase in the retail price of the automobile, presentation of a claim for $1,595.49 would have been a false claim, a charge to the Government of more than the defendants would have been entitled to receive. Insufficiency or artlessness in the wording of the presented statement because of lack of any relation between the statement and a dishonest objective, created the form rather than the substance of untruth. The error, accordingly, lacked the essense of falsity; it was error in a vacuum.

But this is not the end of the Government's reliance in its case against the defendants. As set out in Instruction No. 1, dated August 29, 1946, the Administrator of Veterans Affairs undertook to establish regulations pursuant to Public Law 663. Instruction No. 1 contains the following:

"5. Total cost—$1,600.

"(a). The total sales price of the delivered conveyance, including the following, will not exceed $1,600:

"(1) Cost of conveyance within Office of Price Administration ceilings.

"(2) Cost of special attachments and devices, if any, deemed necessary by the state or other proper licensing agency or a Veterans Administration

contact representative in states of South Dakota, Wyoming, or Louisiana, to operate the vehicle in a manner consistent with his own safety and the safety of others.

"(3) Any tax which is reflected in total sales price. (A payment, such as for state or municipal license plates, will not be included in the total sales price.)

"(4) Equipment such as radio, heater, etc., should the veteran desire such equipment.

"(b) New or used conveyance costing more than $1,600.—In no case will the Veterans Administration assume responsibility for payment of $1,600 as part of the sales price. The total sales price must not exceed $1,600."

The Government's position, if maintainable at all, seems necessarily to rest upon instructions or regulations 5(a) (4) and 5(b) above. This view of the problem necessitates a comparison of the law and regulations, with inquiry as to validity of the latter. Price limitation as fixed by Public Law 663 is in the following language: "* * * at a cost per vehicle or conveyance of not to exceed $1,600, including equipment with such special attachments and devices as the Administrator may deem necessary, * * *." When it is remembered that the automobile here provided is for a veteran who has lost a foot, or both feet, "equipment with such special attachments and devices" can reasonably have reference only to such attachments and devices as will make the vehicle operable by a disabled veteran of the class described. If the law, rather than the regulation, is the determining force, "cost per vehicle" means cost of a vehicle with such special attachments and devices. There is, accordingly, no warrant in the law for a regulation diluting the cost by injecting into it "equipment such as radio, heater, etc., should the veteran desire such equipment," as provided in 5(a) (4) of Instruction No. 1. The same infirmity attaches to regulation 5(b), which reads: "In no case will the Veterans Administration assume responsibility for payment of $1,600 as part of the

sales price. The total sales price must not exceed $1,600." Public Law 663 does not use the words "sales price" in its limitation provision but, instead, uses the words "at a cost per vehicle or conveyance of not to exceed $1,600, * * *." This language, as heretofore indicated, does no more than limit the cost which the Government is authorized to assume. Any conclusion that the veteran may not by separate contract buy accessories or bear the burden of a possible price increase, has no basis in the law but must depend wholly upon the regulations for its justification. In that situation it becomes apparent that the regulations, insofar as they brand the transaction here as illegal, are devoid of legislative sanction.

█ Only one legislative policy can be discerned in Public Law 663. That policy is to add a gratuity to the benefits to which a veteran of the described class is entitled. There is nothing in the law that authorizes or requires supervision or guardianship over the veteran, as to his business transactions, nothing that authorizes the Administrator to devise rules intended to protect the veteran from his own improvident spending, if such is his propensity. But Regulation 5(a) (4) and 5(b) manifest a policy of guardianship and paternalism, for which reason the law springs from one policy while the regulations espouse a broader and entirely different policy.

██ In Panama Refining Co. v. Ryan, 293 U.S. 388, at page. 428, 55 S.Ct. 241, at page 252, 79 L.Ed. 446, the Court said: "So also, from the beginning of the government, the Congress has conferred upon executive officers the power to make regulations—'not for the government of their departments, but for administering the laws which did govern.' United States v. Grimaud, 220 U.S. 506, 517, 31 S.Ct. 480, 483, 55 L.Ed. 563. Such regulations become, indeed, binding rules of conduct, *but they are valid only as subordinate rules and when found to be within the framework of the policy which the Legislature has sufficiently defined*." (Italics added.) The Court referred to Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294, and observed the statement of principle in that

case "that the Congress cannot delegate legislative power, and upheld the regulation in question as an administrative rule for the appropriate execution of *the policy laid down in the statute*." (Italics added.) In Schechter Poultry Corp v. United States, 295 U.S. 495, at page 529, 55 S.Ct. 837, at page 843, 79 L.Ed. 1570, the Court said as to the question of the delegation of legislative power: "We recently had occasion to review the pertinent decisions and the general principles which govern the determination of this question. Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446. The Constitution provides that 'All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.' Article 1, § 1. And the Congress is authorized 'To make all Laws which shall be necessary and proper for carrying into Execution' its general powers. Article 1, § 8, par. 18. The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."

 Delegation to a board or administrative agency of authority to make regulations is not in itself constitutionally objectionable. Heretofore the Veterans Administration has been the recipient of large delegated powers. See especially 38 U.S.C.A. § 705. But there remains the broad constitutional principle that the delegatee must keep within the delegating statute. Waite v. Macy, 246 U.S. 606, 610, 38 S.Ct. 395, 62 L.Ed. 892. In the Waite case the Court said, "No doubt it is true that this Court cannot displace the judgment of the board (Tea Board) in any matter within its jurisdiction, but it is equally true that the board cannot enlarge the powers given it by statute * * *." 246 U.S. 608, 38 S.Ct. 396, 62 L.Ed. 892. If a regulation does not come within the "framework of the policy" of an unambiguous statute, it is invalid. That is the situation here, as to those regulations which furnish the basic grounds for this litigation.

Apart from the regulations and their violation the action is not maintainable, for the reason that the claim bears no taint of illegality. Defendant Black, who admittedly handled the transaction for the company, is a reputable business man who, with respect to these veterans, proceeded in a benevolent spirit and not a mercenary one. Yet if this action were maintainable, he would find himself penalized in an amount of approximately $20,000 for conduct which was devoid of any element of dishonesty or bad faith. Not only that, each transaction was attended by conduct evidencing good faith and a purpose to avoid illegalities. In United States ex rel. Brensilber v. Bausch & Lomb Optical Co., 2 Cir., 131 F.2d 545, affirmed 320 U.S. 711, 64 S.Ct. 187, 88 L.Ed. 417, the Court at page 546 of 131 F.2d said: "Nevertheless, the statute (31 U.S.C.A. § 231) certainly makes fraud of some sort the basis of the liability, and uses the word in its accepted sense of deceit, as appears from the juxtaposition of the three adjectives, 'false,' 'fictitious' and 'fraudulent.'" At page 547 of 131 F.2d, the Court observed that the false claims statute "is not only penal, but drastically penal * * *" and added, "For this reason it has been strictly construed."

The Court, accordingly, is of the opinion that the only just and proper course to be pursued here is to dismiss the action.

Let an order, therefore, be prepared to that effect.

### Supplemental Opinion.

This case is again before the Court on plaintiff's motion to amend findings of fact, conclusions of law and judgment, and on defendants' motion for additional findings of fact. The case was argued at length on a former day of the term and at the conclusion of the arguments the matters were taken under advisement by the Court. By separate order of this day plaintiff's motion for additional findings of fact is sustained to the extent therein shown and in all other respects overruled. The motion of defendants for additional findings of fact is sustained as shown in the aforementioned order. Defendants' motion was made during the course of the argument and transcribed by the court reporter and later passed to the Court.

The Government's attorney in oral argument stressed two propositions. First,

that the Court erred in failing to conclude as a matter of law that intent to defraud the Government under the false claims statute by defendants was implied, or inferred, by reason of defendants' signing the certificate to the invoice showing that the price of each car was $1,595.49, when as a matter of fact the actual cost price of each car exceeded $1,600, and by signing the purchaser's delivery certificate in which the purchaser certified that the purchase price of the car did not exceed $1,600. Second, that the Court erred in construing Public Law 663, 79th Congress, as meaning that "cost per vehicle" meant cost to the Government as distinguished from cost to the veteran.

These propositions will be considered in the order as above stated. The first question as restated is whether intent to cheat or defraud is a necessary prerequisite to liability under the false claims statute. This requires further examination of the statute as set forth in 31 U.S.C.A. §§ 231, 234.

Mr. Justice Black in speaking for the Court in the case of U. S. ex rel. Marcus v. Hess, 317 U.S. at page 537, 540, 63 S.Ct. 379, 382, 87 L.Ed. 443, footnote 2, divided the penalty clauses in the Act in three categories:

> "The first of these clauses, which in our opinion governs the instant case, covers 'Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent * * *.' The second clause governs the use of false certificates, etc., for the purpose of obtaining or aiding to obtain payment of such a claim, and the third covers conspiracy to defraud the government by obtaining or aiding to obtain the payment of a claim."

The first category as above quoted is the one that is applicable to the case under consideration. Section 231 includes several acts which invoke the statutory penalty. As to some of these the section includes intent to defraud as an ingredient of the offense. As to others, specific intent to defraud is not included as such ingredient. The defendants, in citing numerous cases in their original and supplemental briefs, failed to distinguish between the categories of the statute as to intent and omission of intent. The category of section 231 into which this case falls does not use the words "intent to defraud," but contains this language, "knowing such claim to be false, fictitious, or fraudulent".

The case of Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, involved an offense of criminal conversion under 18 U.S.C. § 641, which provides that "Whoever embezzles, steals, purloins, or knowingly converts" property of the United States is punishable by fine and imprisonment. Mr. Justice Jackson, speaking for the Court, held that mere omission from Section 641 of any mention of criminal intent is not to be construed as eliminating that element as an ingredient of the crime. In the course of this opinion he states that there was no ground for inferring any affirmative instruction from Congress to eliminate criminal intent from the offenses of "knowingly converting" Government property. He pointed out that courts of various states that had construed state criminal statutes describing penalties for offenses that were offenses under the common law but which had omitted the ingredient of criminal intent, had held that criminal intent was a necessary ingredient.

Cheating was an offense at early common law. The term cheating was generally applied to defrauding or attempting to defraud by any artful device. Early statutes were passed by Parliament to cover various types of cheating. The following quotation from 35 C.J.S., False Pretenses § 2, page 637, deals with the history of the development of the common law on this subject:

> "As appears infra § 4, while cheating was an indictable offense at common law, no fraud could be the object of a criminal prosecution unless it was of a kind which in its nature was calculated to defraud numbers, as by the use of false weights or measures, false dice

and the like. For this reason it was early perceived that some statutory provision was necessary in order to punish the great variety of frauds which could be practiced with impunity under the common law, and a partial provision on the subject was made by the statute of 33 Henry VIII c 1. As this statute extended only to frauds committed by the use of some visible sign or token, see infra § 4 b, there was enacted the statute of 30 George II c 24, which provided that all persons who knowingly and designedly by false pretenses should obtain from any person money or goods with the intent to cheat or defraud any person of the same should be deemed offenders; as a result of this provision, or equivalent provisions, in state statutes, persons could be prosecuted even where there was no visible token but merely verbal pretenses. It was this statute that created the crime now commonly known as obtaining goods under false pretenses. Several English statutes were thereafter enacted to supply defects found therein, among them the statute of 52 George III c 64 § 1, under which the obtaining of choses in action as well as other property was included."

■ See also an explanation of the common law as we know it in America which may be found in 15 C.J.S., Common Law, § 1 et seq., page 611 et seq. It appears from this authority that common law, as incorporated in the American law, consists not only of principles declared by Judges, but also those enacted into law by Parliament prior to establishment of the Colonies, including also much of the statutory law enacted prior to American independence. Accordingly, the body of the crimes, including cheating and obtaining goods or money by false pretenses, should be regarded as common law crimes. Under the rule of the Morissette case, supra, the conclusion is inescapable that criminal intent, or in a civil case intent to defraud, is a necessary prerequisite to criminal or civil liability under the false claims act.

The case of Cahill v. Curtiss-Wright Corporation, D.C., 57 F.Supp. 614, involved a qui tam action under the false claims statute. Then District Judge Miller, now Circuit Judge Miller, at page 616 of 57 F. Supp., defined fraud as follows:

"Fraud consists in the false representation of a material fact, made with knowledge of its falsity and with the intent to deceive the other party, which representation must be believed and acted upon by the party deceived to his damage."

In the case of United States v. United States Cartridge Co., D.C., 95 F.Supp. 384, District Judge Hulen applied the foregoing definition of fraud as a controlling principle in his decision. At pages 394 and 395 of 95 F.Supp., he said:

"The burden of proof rests upon plaintiff. As to proof necessary to sustain the burden, the authorities which have ruled cases under the False Claims Statute appear to be uniform in their holdings. 'To prevail, the United States must prove fraud of some sort. Fraud implies a misrepresentation of material fact, either express or implied.' See United States ex rel. Weinstein v. Bressler, 2 Cir., 160 F.2d 403, loc. cit. 405. Plaintiff must go further and prove the defendant guilty of 'knowingly concealing or falsifying material facts or making false or fraudulent statements or representations for the purpose of obtaining approval or payment of such claims by the Government.' See Hillgrove v. Wright Aeronautical Corporation, 6 Cir., 146 F.2d 621, 622. There must be an intent to 'defraud the government'. See United States v. Shapleigh, 8 Cir., 54 F. 126, 128."

■ In order to hold the defendants liable in this case the burden is upon the Government to show by the preponderance of proof that defendant Black intended to and did present a false claim to the Government to be paid by the Government. This burden the Government has borne since Black signed the certificate on the invoice and the certificate on the purchaser's delivery ticket, each of which contained false or incorrect statements. But

the showing by the Government that Black signed these false or incorrect statements and presented them for payment is not in itself sufficient to hold defendants liable under the false claims statute. The Government must go further and show that Black intended that the result of his signing such false or incorrect statements was to get something out of the Government to which he knew he was not entitled. In other words, the Government must show that Black intended as a result of the signing of these statements to defraud the Government.

The Government insisted in oral argument and in the briefs that it was not necessary for it to establish this second kind of intent as this would be placing upon the Government too great a burden; that it is impossible to prove the state of mind of any person in the commission of an act; that only the person who acts knows his state of mind.

This second kind of intent may be shown by circumstances surrounding the act so that the Court or jury would necessarily infer fraudulent intent. Thus, if the circumstances are shown from which the Court or jury would necessarily infer fraudulent intent, it is not necessary to try to determine the state of mind of the actor at the time he acts. For example, if a dealer sold a car to a veteran for $1,000 and knowingly submitted a claim for and collected from the Government $1,600, that circumstance would warrant a finding of the second kind of intent, that is, an intent to defraud.

The Court is of the opinion and finds that the Government has failed to establish that Black intended as a result of his intentional signing of the false papers to defraud the Government or to get something from the Government which he knew he was not entitled to receive. This conclusion is further borne out by the fact that Black did not know that the O.P.A. would allow an increase in price on the cars at the time he and his company entered into agreements with the veterans and of course had nothing to do with the increase of price on the cars. As evidence of his good faith in the matter he im-

mediately, after receipt of notice of the increase in price, called the Veterans' Bureau in Nashville and asked to talk to the person in the Veterans' Bureau who handled sales agreements with veterans under Public Law 663. Mr. Black did not know anyone in the Veterans' Bureau at Nashville, so there could be no question of his conspiring with somebody in the Veterans' Bureau. The only contact he had with the Veterans' Bureau was the telephone conversation and the sending in of these papers in this record. In this conversation the person with whom he talked stated to him in substance that he could see nothing wrong in collecting the increase in price from the veteran but that the invoice would have to conform with the sales agreement that had been approved by the Veterans' Bureau at Nashville. Black construed this statement from the Veterans' Bureau as giving him the right to handle the transactions in the way that they were handled by him. From these facts but one conclusion can be reached and that is that in the situation by which Black was confronted and the circumstances and unexpected developments in which he acted there exists no basis for a finding of intent to defraud the Government, nor any basis from which such intent can be inferred.

In the Morissette case Justice Jackson called attention to two kinds of intent. With reference to removal of the Government property by the defendant in that case, he pointed out that removal of the property by Morissette "was a conscious and intentional act". [342 U.S. 246, 72 S.Ct. 256.] This intent related to the act of taking the property. Though that act was intentional, it was a question for the jury and not the Court to decide whether he intended that the result of the taking was to criminally convert it. There is an important distinction between intentionally or knowingly doing a thing and having the scienter or intent to defraud or commit a crime.

Referring to the second proposition raised by the Government which is that the Court erred in holding that Public Law 663 did not preclude the veteran from

paying a portion of the purchase price, the Court has re-examined the act as well as the revised act, which is Public Law 798, 81st Congress, 2nd Session, Chapter 968, S. 3768, 38 U.S.C.A. § 252, and is of the opinion that the views expressed by the Court in the original memorandum are sound. The Government argued that the revised act expressly permitting the veteran to pay a part of the purchase price on the car but limiting the amount to be paid by the Government to $1,600 shows that the original intention of the Congress was to limit the entire cost price to $1,600 with the requirement that the Government pay the entire amount and forbidding the veteran from paying any part on the purchase price.

Public Law 663 contains the following: "To enable the Administrator of Veterans' Affairs to provide an automobile or other conveyance, at a cost per vehicle or conveyance of not to exceed $1,600". The Court construed the word "cost" to mean "cost to the Government." The revised statute approved September 21, 1950, as Public Law 798 contains the following as the purpose of the appropriation provided in said Law: "to enable the Administrator of Veterans' Affairs to provide or assist in providing an automobile or other conveyance by paying not to exceed $1,600, on the purchase price". This change in the wording of the law could be construed in either of two ways, one as changing the legislative policy of the original act, the other as confirming and clarifying that policy.

. The Committee of the House in reporting the bill for consideration, called attention to Public Law 663 and its provisions. The bill being reported on was represented as containing the same restriction and limitation as provided in Public Law 663 "with one exception, namely, that the Administrator is authorized to pay the amount of $1,600 on the purchase price of an automobile or other conveyance where the total purchase price is in excess of $1,600. *This provision takes cognizance of the present prices of automobiles and the likeli-*

*hood of material shortages in the future."* See United States Code Congressional Service 1950, 81st Congress, 2nd Session, page 3779. The italicized language tends to cast doubt on the correctness of the Court's construction of the word "cost" in the original act. However, the underscored statement is not to be taken as the whole legislative history of the revised law. Nor does it purport to state all of the reasons that may have existed for the revision. It is noteworthy that following enactment of Public Law 663, the Veterans Administration established regulations for use in administering the original act. As heretofore observed Regulation 5(b) expressly provided that the money furnished by the Government should not be used in paying for part of the purchase of an automobile. It is not unreasonable to assume that Congress considered this Regulation as being contrary to the legislative intent in limiting the cost of an automobile to $1,600. Nor is it unreasonable to assume that instead of prevailing upon the Veterans Administration to change its regulation, Congress pursued the simpler course of revising the law so as to abrogate Regulation 5(b) and in clearer terms declare the legislative policy and the Congressional intent in providing a gratuity for the disabled veteran, at a maximum cost to the Government. Viewed in the light of this possibility, or probability even, the Court's construction of the term "cost" in the original act as meaning cost to the Government, seems the correct one.

The practical result of this construction is to enable the veteran, if he is financially able and so desires, to purchase a $3,000 car instead of a $1,600 car and at the same time receive the benefit of the $1,600 gratuity from the Government. The construction contended for by the Government restricts the veteran either to a car with a value not in excess of $1,600, or causes him to be deprived of the benefit of the $1,600 gratuity from the Government if he is determined to have a car with a value in excess of $1,600.

The Court will prepare an appropriate order.