Wayne Rosser **ABBOTT**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 15962.

United States Court of Appeals
Fifth Circuit.

Dec. 19, 1956.

James H. Martin, Dallas, Tex., Chas. C. Crenshaw, Lubbock, Tex., Joe H. Jones, Dallas, Tex., Crenshaw, Dupree & Milam, Lubbock, Tex., for appellant.

William O. Braeklein, Asst. U. S. Atty., Dallas, Tex., Heard L. Floore, U. S. Atty., Fort Worth, Tex., for appellee.

Before CAMERON, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Abbott, convicted for interstate transportation of a stolen geophysical map having a value exceeding $5,000.00, 18 U.S.C.A. § 2314, and use of the mails to defraud, 18 U.S.C.A. § 1341, appeals from a single sentence, urging primarily that motion for judgment of acquittal ought to have been granted for insufficient evidence on (1) value and interstate transportation under Section 2314, and (2) substantial use of the mails to execute a fraudulent scheme under Section 1341.

Despite vigorous denials by Abbott and many circumstances pointing toward innocence, there was substantial evidence from which, in weighing the conflicts, the jury could find Abbott to have been, if not the moving spirit, at least the willing beneficiary and financier of a plan by which he got prints of geophysical maps stolen from Magnolia Petroleum Company.

The arrangement came into being this way: Morgan, employed then as a draftsman by Magnolia but having no access to maps or exploratory information, persuaded Fox, employed in Magnolia's Blue Print Department, to supply Morgan an extra copy of prints of geophysical reflection survey maps as they

were from time to time ordered by various departments of Magnolia. Morgan told Fox that he thought he knew a man willing to pay substantial sums for such prints. He had in mind Abbott, a young business man bearing a good reputation in Oklahoma City, engaged as a consultant and trader for his own account in working up and exploiting typical trades for acreage, mineral interests, drilling of wells, farm outs and the like. In March 1951, at Dallas, Morgan took to Abbott a print from Fox as a sample. Abbott paid Morgan some $300.00 in cash for that print and agreed to pay him $350.00 per month thereafter. For this Morgan was to supply as many maps as his "contact" could furnish. Morgan, turning over one-half of this cash to Fox, agreed to pay Fox $150.00 each month. The arrangement continued until sometime in 1953, Abbott paying some $3,000.00 to $4,000.00 to Morgan, and Morgan paying about $1,500.00 to Fox. A total of twenty to forty prints were purloined.

Fox's part was simple: he knew nothing of the intrinsic significance of any maps and none was under his custody except while making extra prints ordered specifically from time to time by various officials or departments of Magnolia. He automatically made an extra print, surreptitiously removed it from Magnolia's office building, and delivered it to Morgan.

Morgan, holding none 'for more than a week, delivered to Abbott, in person or by mail, all of the prints supplied by Fox. Several of the prints were later seen in Abbott's possession, and the print, or a copy of it, specified in the count under Section 2314, was in his office in Oklahoma City. Abbott's use of at least one of these prints as a basis for overlays subsequently employed by his associates to procure leases in the area, and use of another in conferences resulting in a farm-out trade, manifested his estimate of the practical value of these map prints.

■ So far as Section 2314 is concerned, we agree that the judgment of

acquittal should have been entered. This count specified, as it had to, a particular map print of a specific area. The record adequately proving its purloining by Fox, transfer to Morgan, and furnishing by him to Abbott was yet completely negative on interstate transportation from Texas to Oklahoma. *Who* carried it, or how, or who caused it to be transported was nowhere proved. Since it was undisputed that by the auto-positive process additional blue-line Ozalid prints could be made from the stolen prints, the mere physical presence of the print in Oklahoma City was insufficient to establish that it was Abbott, or one instructed by him, who carried or caused it to be transported.

■ Transportation interstate, which alone creates the Federal crime, was an indispensable ingredient. So too, was value in excess of $5,000.00. Congress has prescribed the exclusive criteria for value, 18 U.S.C.A. § 2311:

> " 'Value' means the face, par, or market value, which ever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a single indictment shall constitute the value thereof."

But the Government never established either that there was a market for the sale, purchase and trade in prints of geophysical maps or a market value. One witness put the value at not less than fifty thousand dollars and perhaps as high as two hundred thousand, but it was positive that his criteria was the cost to Magnolia for the geophysical exploratory work represented by the maps or its "value" to oil lease traders and promoters in working up trades for that area. If this was intrinsic or actual value, and that is extremely doubtful, it was certainly not market value, for even the one geophysicist whose words were in terms of a "market" ($10,000.-00 or more) acknowledged categorically that he knew of no market for their sale in the well-defined meaning of that term. Indeed, the Court sustained objections to his testimony on "market" value, be-

cause of his candid disqualification. His subsequent loose use of the words "market value" could not, in the face of that objection and proper ruling, amount to proof on such an essential element.

■ Congress plainly restricted value to three well-understood standards. Mere cost of production, cost of replacement, value to the owner, value to one who might have use of it under certain special circumstances, whatever else it might be, is not market value. For that value—market—depends on a market, whether formal or informal, in which willing buyers bargain with willing sellers.

Plain language of the Congressional Act makes unnecessary, if not proscribed, a rationalization of the legislative precision in fixing the *kind* of values. But it is not lacking. The very requirement of a $5,000.00 value points towards a Congressional purpose carefully to limit the Federal sanction in theft of non-ambulatory things to those having a substantial worth. To have prescribed actual or intrinsic value as a test would have but multiplied uncertainties in which worth would, or might be, fixed by undulating elusive factors of which personal sentimental attachment, collateral cost of production, unique value to a particular person are but typical.

■ But the matter stands differently when it comes to the mail fraud, 18 U.S. C.A. § 1341, count in which the pleading description of the scheme to defraud was an abbreviated paraphrase of the evidence summarized above followed then by a specific charge that, in its furtherance, the mails were used by Abbott on December 15, 1951, to transmit a letter and two "payment" checks to Morgan. Sending the letter [1] and checks was admitted, but Abbott's explanation, rejected by the jury, was that these checks were two payments for legitimate map-drafting work done by Morgan; and the reference to supplying future maps was to encourage Morgan to submit deals, or trades, or farm out propositions which, in the past, Morgan normally offered by "maps."

Abbott's contention [2] here is basically

---

[1] "Mr. Bill Morgan
"2011 Bennett
"Dallas, Texas
  "Dear Bill:
"Attached hereto are two checks totalling $700.
"We have not received the maps that I anticipated getting. However, I fully realize that under the circumstances no set schedule can be made on delivery.
"From hereon I wish to make arrangements with you wherein I pay a certain sum of money and/or interest for any maps received. This by no means is to indicate that I will terminate doing business with you for the maps, but in view of the fact that I have not been able to acquire leases or drilling deals, I am placed at a severe handicap.
      "Sincerely yours,
      "(signed) Wayne
      "Wayne R. Abbott
"WRA:c
"Enclosures Cks Nos. 1048 and 1049
"P.SS. Give this money to your fine wife and children for X'Mas—you bug!"
Two checks dated December 15, 1951, payable to Bill Morgan in the respective amounts of $300.00 and $400.00, each showing on its face "Geological and drafting services for November" and " * * * December" were enclosed.

[2] Appellant's brief (page 22) elaborates further:
"It is the contention of appellant that the proof in the Record shows only a scheme of Fox and Morgan to commit the crime of theft from time to time and that such evidence shows only a taking of property and no fraud or deception or deceit of any kind was perpetrated upon the Magnolia Petroleum Company. Further, Appellant contends that the letter dated December 15, 1951 written from him to Morgan was not contemplated and could in no wise further and assist the scheme of Fox and Morgan to steal maps or blue line copies of Maps from the Magnolia Petroleum Company. Section 1341 of Title 18 under which Count No. 18 of the indictment was drawn, contemplates some sort of an artifice to defraud and covers those crimes which involve a devious, contriving, disingenuous scheme involving an artifice trick, false pretense or token. This is the holding of Stockton v. United States, [7 Cir.] 205 F. 462 and Harrison v. United States, [6 Cir.] 200 F. 662; Horman **v.** United States, [6 Cir.] 116

twofold: (1) there was no scheme to defraud Magnolia; and (2) transmission of the checks by mail was not contemplated, was incidental, and could not have furthered the execution of the scheme.

The first is, of course, palpably unfounded. For Magnolia Petroleum Company was, in fact, and in a very real sense, defrauded. It had, at great expense, for its own proper use, undertaken geophysical surveys and prepared maps reflecting the information gathered and evaluated[3] by trained scientists. These were papers of almost inestimable practical value in the essential program of continuous exploration and development of mineral resources which is the life blood of an oil producing company. On them it could make its plans and the very act of reproducing extra copies (which gave Fox access) was to enable a project to be executed. Additionally, they had a "negative" value which continued only so long as they were the confidential information of the company, and which was lost or diminished the moment a map fell into the hands of an outsider who, in anticipation that the company might undertake development, could move swiftly into the area, procure leases, and impede or thwart the company's plans.

■ This scheme had as its sole purpose to destroy the rightful exclusive enjoyment by Magnolia of its own property. Abbott was to acquire use of it without Magnolia's consent, and indeed, by the stealthy, devious means of subverting the fidelity of its trusted servant. Comparatives seem to be of little significance here, but if they are, this was not simple *theft*. It was something more—for traditional theft would not have gone undetected over this long period of time, and its fruits—stolen maps —would have been virtually worthless papers had there been no prearrangement for their purchase and use. And

Fox's technical incapacity for discerning evaluation of the significance of each map made it essential that the process be a continuous one and not a mere succession of isolated, separate takings. The object was to filch from Magnolia its valuable property by dishonest, devious, reprehensible means. That is to "defraud", for "the law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity," Weiss v. United States, 5 Cir., 122 F.2d 675, 681, certiorari denied 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550; Shushan v. United States, 5 Cir., 117 F. 2d 110, 133 A.L.R. 1040, certiorari denied 313 U.S. 574, 61 S.Ct. 1085, 85 L. Ed. 1531; Kreuter v. United States, 5 Cir., 218 F.2d 532, certiorari denied 349 U.S. 932, 75 S.Ct. 777, 99 L.Ed. 1262, citing with approval Henderson v. United States, 6 Cir., 202 F.2d 400.

■■ Did the specified act of mailing the letter and checks (note 1, supra) further the execution of that scheme? On this inquiry, it is, in this case, unlike a charge of conspiracy to use the mails to defraud which, being an *agreement*, calls for proof on an *intended* use of the mails. Guardalibini v. United States, 5 Cir., 128 F.2d 984; Weiss v. United States, supra, immaterial whether the probable, likely use of the mails was contemplated either at the outset or during the performance of the scheme. Morris v. United States, 5 Cir., 112 F.2d 522, certiorari denied 311 U.S. 653, 61 S.Ct. 41, 85 L.Ed. 418. The statute forbids the *use* of the mails as the means of consummating frauds, and if the mail is used in its actual execution, it matters not whether it was intended or anticipated. Silverman v. United States, 5 Cir., 213 F.2d 405, certiorari denied 348 U.S. 828, 75 S.Ct. 46, 99 L.Ed. 653; Kreuter v. United States, supra; Henderson v. United States, supra; Stryker v. United States, 10 Cir., 95 F.2d 601.

Once the existence of the scheme is

F. 350 and United States v. Bachman, [D.C.] 246 F. 1009."

**3.** The maps not only showed the usual elevation contour lines, but the legend identified special markings for good prospects as "areas of interest" marked on some of the structures.

assumed, the answer is compelling that the mailed matter did further it. The very heart of this dishonest business was that Fox, for a price would cheat his employer, Morgan for a price would subvert Fox's fidelity, and Abbott, by paying the price of both, would reap the fruits. As the old, old story of twenty pieces of silver, it began, it continued, by the promise and payment of money. Unless the money was paid, no prints were to be taken or delivered, and Morgan, proved to have been an impecunious person of general and financial irresponsibility, could not keep his bargain to Fox unless Abbott provided the cash. Sending and paying money was as to Fox and Morgan the complete essence and fulfillment of the scheme. It could hardly have been casual, or merely incidental,[4] and in no sense was it, as a part of a continuous scheme that ran for another year, an act done after the plan was terminated, cf. Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88.

Abbott's procedural complaints revealed no harmful error: the charge, as a whole, fairly presented the issues, correctly instructed the jury on the law, and, where discussing the evidence made it clear that the Judge's comments were not binding on the jury. Imposing a small fine, in the presence of the jury, on one of Abbott's counsel for recurring (though inadvertent from partial deafness) conversations between co-counsel which were audible to the jury was but a mild remonstrance to keep a vigorously fought battle in bounds. Re-

strictions, at one stage, on the cross examination of the witness Atterbury, designed to show an animus toward Abbott, if erroneous in form, could have caused no substantial harm since the circumstances of the relationship between Atterbury and Abbott, the assertion and pendency of adverse litigation and claims, the giving of adverse testimony and other proceedings, were fully developed. Refusal to admit certified copies of some state court indictments against some unidentified third party for theft of geophysical maps in Midland, Texas, in no way identifying the maps or prints stolen, was within the Judge's discretion. This was especially so since the fact of the theft and illegitimate reproduction and sale of some maps in Midland was mentioned by several witnesses. The indictments would merely corroborate what was not really doubted. The issue here was whether Abbott got the maps, as he claimed, in Midland from some completely unidentified source or whether, as Morgan testified and the jury found, he got them from Morgan pursuant to the plan. The trial was fair and all procedural matters, whether discussed, have been carefully considered and found without merit.

The judgment as to count XV under 18 U.S.C.A. § 2314 for illegal transportation is reversed with directions to enter judgment of acquittal; but as to count XVIII, under 18 U.S.C.A. § 1341, is affirmed.

Reversed in part.

Affirmed in part.

---

4. The mail fraud count, while not in terms of conspiracy, did set out the general scheme with the use of the mails confined to the one specific incident of December 15, 1951. However, in establishing the scheme and its operation, the proof showed that the mails were frequently used in the transmission of the money (or checks intended to be Abbott's business record where cash had been paid to Morgan) and in Morgan's sending many of the prints from Dallas to Abbott in Oklahoma City; and another letter sent to Morgan postmarked December 6, 1951, handprinted by Abbott, reflects both the devious nature of the

scheme and the routine dependence on use of the mails as a means of keeping a continuing enterprise, cf. Owens v. United States, 5 Cir., 221 F.2d 351; Weiss v. United States, supra, moving at an "efficient" pace:

"Monday Nite
"Dear Bill,
"I expect to be in Dallas Tuesday late or Wednesday morning—I have your assignment on the East Texas Block "-/-" *some money—you had better have some maps where I can find some open acreage.*

"Love & kisses
"Wayne"