**Melvin DOWLING, Hattie Knight and Aubrey Rhoden, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 16458.

United States Court of Appeals Fifth Circuit.
Nov. 22, 1957.

Jack J. Gautier, T. Reese Watkins, T. Arnold Jacobs, Macon, Ga., for appellants.

Floyd M. Buford, Asst. U. S. Atty., Frank O. Evans, U. S. Atty., Macon, Ga., for appellee.

Before HUTCHESON, Chief Judge, and BORAH and CAMERON, Circuit Judges.

BORAH, Circuit Judge.

The appellants, Melvin Dowling, Hattie Knight, and Aubrey Rhoden, together with twenty-eight other named defendants,[1] were indicted for conspiracy to violate the Internal Revenue laws [2] with reference to the possession of unregistered stills and distilling apparatus; carrying on the business of a distiller without posting signs or giving bond; the making or fermenting of mash on unauthorized premises; the removal, concealment, possession, and transporta-

tion of nontaxpaid distilled spirits; the possession of property used or intended to be used for violation of the Internal Revenue laws; evasion of the distilled spirits tax; and carrying on the business of a wholesale and retail liquor dealer without posting signs or paying the special tax required by law. In addition, certain of the named defendants were also charged in ten counts with various substantive offenses involving violations of Section 7206, Internal Revenue Code of 1954. Prior to arraignment the government dismissed all of the substantive counts, and the fourteen defendants, including appellants, who pleaded not guilty went to trial before a jury and were found guilty of conspiracy as charged in Count 1 of the indictment. Dowling was sentenced to imprisonment for a term of two years and Rhoden and Hattie Knight were each sentenced to imprisonment for a term of one year and one day.

Upon this appeal the appellants raise three claims of error. The first and principal contention, which is urged by all of the appellants, is that, while the government charged a single conspiracy, the evidence disclosed by the record proved not one, but five separate and distinct conspiracies and that accordingly there was a fatal variance between the indictment and the proof. The second point urged upon us is that the evidence failed to show that appellants were guilty of the conspiracy charged in the indictment. Finally, it is claimed on behalf of appellant Hattie Knight that the court erred in refusing to grant her motion for severance.

With reference to the first and second specifications of error, it is conceded by appellants in argument and in brief, that the government's proof shows that defendants Terrell Knight (son of appellant Hattie Knight), Thurman Wilkes, Lester Alligood, and Curtis Farmer, each.

[1] Thirty-six other persons were alleged to be conspirators but were not made defendants.

[2] §§ 5174, 5601, 5606, 5608, 5632, 7206, 5008, 5642, 5646, 7302, 5116, 5180, 5681, and 5691, Internal Revenue Code of 1954, 26 U.S.C.A. §§ 5174, 5601, 5606, 5608, 5632, 7206, 5008, 5642, 5646, 7302, 5116, 5180, 5681, 5691.

operated illicit liquor businesses in various counties in the State of Georgia, and that appellant Dowling, together with his brother-in-law, defendant Frank Green, was engaged in making and selling illegal liquor in Baker County, Florida. It is also admitted that there is some evidence that on one occasion Dowling brought sugar and bran from Rhoden under circumstances which would place Rhoden on notice that these materials were being used by Dowling in making liquor. It is further admitted that the evidence fairly shows that a number of the defendants were in various degrees acquainted with each other and associated together, but it is argued that all of these liquor operations were separate, independent and wholly distinct from each other. This contention therefore clearly requires that we give some consideration to the evidence relating to the defendants' activities, which, if believed by the jury, tended to prove that they were indeed members of a single, but widespread and long continued conspiracy.

On September 12, 1955, an illegal distillery having a daily production capacity of 456 gallons, was seized in Houston County, Georgia, and defendants William Gainey, an avowed "bootlegger", and Robert Gainey were arrested. Thereafter, James Edward King, an agent of the Alcohol and Tobacco Tax Unit of the Treasury Department, was assigned to make an investigation as an undercover agent in Houston County, Georgia, and vicinity. During October and November, 1955, and as a part of his investigation, King became acquainted with various persons in that locality and bought small quantities of nontaxpaid whiskey from several of the named conspirators, including defendant Melvin Alford. Alford at that time was employed by defendant Terrell Knight at Knight's Truck Stop, a service station and cafe located near Haynesville, Georgia, in Houston County. Directly across the highway from the Truck Stop was a residence which was occupied by Alford, and about seventy yards therefrom on the same side of the highway was located a small country store which was operated by appellant Hattie Knight. In this same general locality, about one mile down the highway lived defendants Terrell Knight and Charlie Hamsley. In this connection, and as the evidence hereinafter detailed will show, the Truck Stop, situated as it was in close proximity to Mrs. Knight's store, Hamsley's barn, and Alford's house, was the headquarters and rendezvous point for the operations of the key figures in all of the transactions proved.

Agent King frequented the Truck Stop regularly during the period aforementioned. On the night of December 5, 1955, another illegal distillery in Houston County was seized and destroyed, and defendants Jerome L. Jones and William Gainey were arrested at the still site. On the evening of the following day, defendants Terrell Knight, William Gainey, Curtis Farmer, Alford and co-conspirator Carl Durden met together at the Truck Stop and discussed this seizure. Later on the same night, King in company with Alford and William Gainey drove out a dirt road behind the Truck Stop for the purpose of locating some liquor which his companions had hidden in the woods. Several days later, and on the occasion when Alford and King were driving to Dawson, Georgia, in defendant Hamsley's automobile, Alford talked at great length of plans to put up a new still and told agent King that the liquor which he had previously sold to him was a part of the liquor which he, Alford, had helped make. On the night of December 20, King again met Alford at the Truck Stop from which point they drove to Culloden, Georgia, for the purpose of finding a site for the new distillery. During this trip Alford stated that Terrell Knight would back the still if a good location could be found.

Plans for the erection of the Culloden still were never completed because no suitable site with an adequate supply of water could be located. But other sources of supply were available, for in the

early part of January, Terrell Knight and Alford made arrangements to buy wholesale quantities of nontaxpaid whiskey from co-conspirator Bobby Neal Jackson who had undertaken to set up four new stills. And on January 19, 1956, Alford in conversation with agent King at the Truck Stop engaged King to haul liquor from Florida to Georgia for Knight. That evening, on instructions from Knight, King drove Knight's truck to defendant Hamsley's barn where he met Knight and together they loaded the truck with some sacks and a plywood covering which fitted the truck bed. On that occasion, Knight gave King ten dollars and instructed him to follow a Chrysler automobile driven by co-conspirator Durden. Pursuant to these instructions, the agent followed Durden to the residence of co-conspirator Solomon Burnsed near the Georgia-Florida line where they met co-conspirator Leo Burnsed and Knight who had driven to Florida in an Oldsmobile. At that time Durden aided by King installed "booster springs" on the Chrysler for the purpose of concealing the fact that the automobile was heavily loaded. Knight then purchased from Leo Burnsed 170 gallons of nontaxpaid whiskey which was loaded in the Chrysler automobile. While Burnsed and Durden were loading the car, Knight spoke freely about all of the cars he had previously owned and which had been seized while engaged in illicit liquor traffic and of the stills that he and defendant Farmer had lost in such seizures. After the Chrysler had been loaded and inspected, Knight and the agent, driving the Oldsmobile and truck, respectively, followed Durden in the liquor car to appellant Rhoden's store in Baxter, Florida, where Durden purchased gasoline for his automobile and after receiving instructions from Knight as to certain deliveries of liquor to be made in Georgia from the supply which Durden was transporting to Houston County, Durden departed for Georgia. Knight and King remained in Florida, however, until about midday on January 20, during which time Knight tried to buy more whiskey in the vicinity of McClenny, Florida, but was unable to do so at a reasonable price. Whereupon, King and Knight, by way of different routes, returned to the Truck Stop.

During the month of February, agent King made four additional trips to Florida to purchase nontaxpaid whiskey for Knight, and in the meantime between trips he assisted in filtering, pouring into jars, and delivering liquor to customers at Knight's direction. On the night of February 4, Alford asked King to work in his stead at the Truck Stop while he went with co-conspirator Durden "to get some stuff." While they were gone, Hattie Knight came to the Truck Stop and voluntarily asked whether Alford had gone with Durden. She also made an inquiry as to the identity of two men who had driven a furniture truck to the Truck Stop, stating that the men looked like revenuers, and "I know them all. * * * I know about all of them." Later the same night, Alford and King were instructed by Knight to pour into jars some of the liquor which was hidden in a stash near defendant Lucious Duncan's residence some five miles from the Truck Stop. On that occasion, Hattie Knight gave Alford the keys to her store, and both Alford and King then obtained from the store eighteen cases of one-half gallon glass jars, and hauled them in Knight's car to the stash, where defendant Farmer also had some liquor stored. Upon arrival, they first filtered and then poured into the jars which they had brought with them eighteen cases of nontaxpaid whiskey. The empty cans from which the liquor had been poured were then loaded into Knight's automobile and taken to defendant Hamsley's barn. About two weeks later Alford and King poured more liquor into glass jars at Knight's stash on Duncan's premises and as they were leaving the site in Knight's automobile, they met Knight on the road driving a red car which was usually operated by co-conspirators Horace McElheney and Carl Holley. On instructions from Knight, Alford and King re-

turned to the stash and helped Knight load twenty five-gallon cans of nontaxpaid liquor into the red automobile. Knight then drove away from the stash in the loaded car, and shortly thereafter returned in a Dodge pick-up truck accompanied by defendant Raymond Walden. Between 10:00 and 10:30 p. m., Alford and King, on instructions from Knight, returned to the Truck Stop and obtained thirty-three additional cases of one-half gallon jars from Hattie Knight's store, and took them to the stash. They were filling the jars with whiskey when Knight and Walden came to the stash for a second time, this time in Knight's Chrysler automobile. The Chrysler was then loaded with liquor and driven away. Before 6:30 a. m. the following morning, Knight returned to the stash for a fourth time, and as on the previous trips, he loaded the car with jars of liquor and drove away. Thereafter, and on the same day, Knight supervised and convoyed agent King in another trip to Florida to purchase nontaxpaid whiskey. On this trip they met defendant Frank Green and appellant Dowling, and at Dowling's stash they loaded 310 gallons of liquor into the car driven by King, purchased gasoline from appellant Rhoden for the return trip to Georgia and began the journey home. While en route the car driven by King broke down, and when Knight was unsuccessful in his attempts to communicate with defendants Wilkes and Farmer for assistance, the liquor was unloaded and hidden on the side of the road. Thereafter, on the following morning, Knight hired a mechanic to repair the liquor vehicle, and brought several men from Rhoden's store to help reload the liquor car. Before leaving Florida on the return trip, Knight communicated with co-conspirator Paul Burnsed and was told by him that there were three men in the area each of whom had 300 jugs of illicit whiskey to sell. Then Knight directed King as to the route he should follow to the stash at Duncan's residence, and King returned to Georgia as directed.

The third trip to Florida made by agent King was under Knight's explicit directions. At 11:00 p. m. defendant Green met King, convoyed him to Dowling's residence and there they unloaded empty liquor cans. King slept in his car which was parked in Dowling's yard until the early hours of the following morning when he was awakened by Green and Dowling who told him that Knight had sent word that he was to use his own judgment as to the route he should take on his return to Houston County. As on the previous trips, Green led King to Dowling's stash where they loaded forty cans of liquor in King's automobile. King thereafter purchased gasoline at appellant Rhoden's store and drove to Georgia, unloaded the liquor at the stash near Duncan's residence and returned to the car which he was driving to Hamsley's barn. On his fourth and fifth trips to Florida, King, under instructions from Knight, procured nontaxpaid liquor from appellant Dowling, aided and assisted by Dowling's brother-in-law Frank Green. On one of these trips, appellant Rhoden brought some sugar and bran to Dowling's residence, received $336 in payment therefor and assisted in unloading these supplies and placing them in Dowling's shed. On the other trip, Knight instructed King to tell Dowling that he would see him the next day, and upon arrival at Dowling's residence Dowling reported to King that he had communicated with Knight by telephone the night before and was advised to warn King that when he telephoned Knight on business to talk only to Knight or to Mrs. Hattie Knight. Following each of these trips to Florida, the nontaxpaid whiskey was taken to the stash at Duncan's residence, and thereafter delivered to customers on Knight's various customer routes in Georgia, two of which were the Houston County Route and the Hawkinsville Route. And as before when deliveries were made, King, Alford and Knight went to the stash, filtered, poured into jars, and distributed to customers the whiskey which had been brought there from Florida and else-

where. On each such occasion fruit jars were obtained from Hattie Knight's store. Once, while they were engaged in loading the car with the jars, Hattie Knight stated, "Hurry up before someone sees you," and with reference to a felt bag used in the filtering of liquor which Terrell Knight took from her storeroom, she asked him, "I know what the bag is for, but can it be used for anything else?" to which he replied, "No, that's what it's made for."

During the month of March, the stash at Duncan's residence was raided. And shortly thereafter defendant Alford was arrested in Abbeville, Georgia, in connection with the transportation of illegal liquor for Knight. Appellant Hattie Knight who had telephone conversations with both Alford and the local sheriff, was actively instrumental in formulating and communicating an alibi for Alford. She also warned King "to be sure to keep our tale (relating to Alford) straight." During this month more trips were made by King under Knight's instructions to purchase supplies of nontaxpaid liquor from appellant Dowling and others who had such whiskey for sale. On one of these trips Knight instructed King to tell Dowling "if he needed any sugar this week to let him know." King advised Dowling what Knight had said about the sugar and Dowling stated to King, "I won't need the sugar this week. I've already ordered some and tell him I won't have any more liquor before the weekend." Another of King's trips was made in Hattie Knight's automobile with her permission, and when King reported to her that three loads of liquor in Florida were promised, Hattie Knight nodded her head as if in agreement. It was on the occasion of this trip that Rhoden, in the presence of King, told the men at his store to "tell the boys when they bring this truck in here to either take them barrels off of it or turn it around." And while the agent was on the premises, he observed distilling equipment [3] in a small warehouse behind Rhoden's store.

In the early part of April, Knight stated that he was planning to let defendant Thurman Wilkes help him if they were going to use his car, and thereafter Wilkes and Knight were in close association. When Wilkes' car broke down and his supply of nontaxpaid liquor had to be hidden near a roadway, Wilkes borrowed Knight's automobile for the purpose of removing the hidden liquor. Thereafter, defendant Alligood's automobile was used extensively for the purpose of delivering liquor to Wilkes' customers, and Wilkes, through instructions to King dealt with Rhoden in Florida, sending the message to tell the boys that he, Wilkes, would be down later to pick up some whiskey. During the same period, Knight stated that Alligood had "hollered" when Knight charged him $3.50 for liquor. When Wilkes had an automobile accident on April 27, it was Knight who instructed the wrecker where to go and who brought Wilkes back to the Truck Stop in Farmer's automobile. On King's tenth trip to Florida, and on instructions from Wilkes, he communicated with appellant Rhoden who led the agent to the residences of several suppliers of nontaxpaid whiskey who, in turn, assisted King in loading the liquor into his automobile. On April 29 and again on April 30, King made trips to Florida, this time on instructions from both Knight and Wilkes to procure nontaxpaid whiskey. On one of these trips Rhoden requested that he tell Knight that "I've got 160 jugs of liquor if he wants them."

In May, 1956, Knight began buying liquor from co-conspirator Tom Anglin located in Willacoochee, Georgia, and he devised a storage place behind the Truck Stop which the witnesses called "the cinder block stash." The trips to Baxter, Florida, became less fruitful, and on one such trip appellant Rhoden accompanied King to the homes of several of the co-conspirators in an effort to obtain wholesale quantities of illegal whiskey for sale and distribution in Houston County,

3. A still cap, scrap copper, twenty or more sacks of scratch feed, several stacks of five-gallon cans, a roll of copper tubing, and some sheets of galvanized tin.

Georgia. One of them had some liquor, but insisted that it be taken out in one trip so as to avoid detection of the location of the still, whereupon appellant Rhoden told King to tell Knight that "they had 182 jugs waiting for him." During this month, Farmer and Wilkes established a stash near a church which was located about three miles from the Truck Stop in Bleckley County, and they, together with Alligood made deliveries of wholesale quantities of liquor to Putnam County, north of Macon, and elsewhere. They made numerous trips to a distillery located in Montgomery County, Georgia, and stored the liquor obtained therefrom in a stash which had been established in Wilcox County, south of the Truck Stop. The defendants worked, as was their custom, under the cover of darkness; they exchanged information, automobiles, customers, and advice as to the whereabouts of federal and local law enforcement officers. And thus, their combined operations continued until the last week of June, 1956.

■ We have carefully and painstakingly read this lengthy record and have given the most earnest consideration to each defendant's case separately, for the purpose of determining whether he was convicted of the conspiracy charged, or whether, as contended by appellants, the defendants were convicted of separate and distinct conspiracies, each having no real and substantial connection with the other. And we have reached the firm conviction that the defendants, including appellants, were parties to a single conspiracy, continuous in operation, and singular in character, and that the evidence was clearly sufficient to support the jury's verdict.

■ The remaining question confronting us for determination is whether the trial court erred in denying appellant Hattie Knight's motion for severance. We think the ruling of the trial court must stand. No principle in the law is more clearly established than that the granting or denial of a motion to sever rests in the sound judicial discretion of the trial court, and a refusal of

a severance is not a ground of reversal, unless abuse of discretion be affirmatively shown. Duke v. United States, 5 Cir., 233 F.2d 987; Corcoran v. United States, 5 Cir., 229 F.2d 295; Raarup v. United States, 5 Cir., 23 F.2d 547. The record does not show that appellant would be or that she was prejudiced by the denial of her motion for a severance. Throughout the trial and whenever evidence was introduced which was competent against one or more of the other defendants, but incompetent against appellant, the trial judge carefully cautioned the jury against considering that evidence in passing on the charges against defendants other than the one (or ones) against whom alone that evidence was admitted. We do not think that it appears from the record that the court's discretion was abused by its refusal of a severance.

Finding no reversible error in the record, the judgment is accordingly

Affirmed.