Alton T. MILAM, Burr F. Sprague and Robert B. Kimball, Appellants,

v.

UNITED STATES of America, Appellee.

No. 19398.

United States Court of Appeals Fifth Circuit.

Aug. 29, 1963.

Rehearing Denied Oct. 14, 1963.

Johnson, District Judge, dissented in part.

Alton T. Milam, R. P. Williams, Newell Edenfield, Atlanta, Ga., for appellants.

Robert C. Milam, Asst. U. S. Atty., Atlanta, Ga., Charles L. Goodson, U. S. Atty., Edgar L. Jenkins, Asst. U. S. Atty., for appellee.

Before TUTTLE, Chief Judge, BROWN, Circuit Judge, and JOHNSON, District Judge.

JOHN R. BROWN, Circuit Judge.

We are required by this appeal to determine if the indictment is sufficient, if the Judge should have granted a severance, if there was substantial evidence to support the jury's verdict, if the Appellants have been unduly prejudiced by the testimony of a Postal Inspector, if the Appellants have been prejudiced by the Judge's actions toward defense counsel, and if the Judge erred in allowing certain exhibits in evidence and in refusing to strike certain testimony.

The Appellants, along with several others, were indicted for violation of the mail fraud statute, 18 U.S.C.A. § 1341. Of the original participants involved in the scheme, one is deceased (Appenzeller, the Secretary of Metropolitan), one was not tried, and one was tried and received a directed verdict of acquittal. The remaining defendants (Appellants here), Sprague, Milam, and Kimball, were convicted and sentenced for having devised a scheme to defraud certain named victims through the use of the mails. It is from this conviction that each of the Appellants has perfected his appeal to this Court.

Briefly, we will set out the general nature of the scheme as adduced through four days of trial and some 750 pages of testimony. A more complete discussion of the facts will be undertaken in disposing of the various assignments of error. Metropolitan Investment Service Corporation with an office in Atlanta, Georgia, operated what is commonly known as the "advance fee" scheme. It mailed letters to businessmen who were to reply if they were interested in obtaining a loan. These prospective borrowers were then interviewed by one of the members of Metropolitan, usually Kimball. During this interview it would be pointed out that Metropolitan needed financial state-

ments, references, and a certified or cashier's check to cover expenses of obtaining the loan. The Government's witnesses testified that Kimball almost invariably told them that the check would not be cashed until the loan was approved, at which time it would be applied to the first interest payment. They were told that in the event the loan was not approved, the check would be returned. The typical story was one of high-pressure salesmanship in which the victim found himself signing a contract, issuing the check, and never seeing either the loan or his check again.

The three Appellants in this Court were tried at the same time, and while represented below by separate counsel all are represented by the same lawyer here. Each presents substantially the same questions for our determination. As we have found from a careful reading of the record that it is necessary to reverse the conviction of Milam, we will dispose of his appeal first.

Milam is an attorney. In that capacity, he was approached by Kimball who wanted to charter a loan company. Milam consulted with Kimball and Sprague about the matter. Milam applied for a Georgia charter in the name of Metropolitan Service Corporation. This name was not available, so the charter was ultimately issued to Metropolitan Investment Service Corporation. Milam and two secretaries in his law office were the incorporators. Initially, Metropolitan was organized with Kimball as president, Sprague as executive vice-president and Milam as secretary. After the organizational period (about two weeks), Milam resigned as secretary. To this point, there is nothing unusual about the conduct of Milam. It is a common practice, known to all, that frequently the lawyer employed to secure a charter is also an incorporator and an officer for organizational purposes.[1] Milam testified that from that time on he was merely the attorney for Metropolitan

---

1. At the initial hearing, prior to Milam's arrest, the United States Commissioner refused to issue a warrant for Milam because the Commissioner in his own words,

on a retainer basis. In other words, the Government's case showed that Milam as counsel for Metropolitan expected to receive payments from it by way of retainer. It is undisputed that Milam's name nowhere appears on the material mailed to the victims, nor did he actually do any of the mailing. Of course, we recognize that it is not necessary that a defendant actually do any of the mailing so long as there is sufficient evidence to tie him to the fraudulent scheme which involves the use of the mails. Abbott v. United States, 5 Cir., 1956, 239 F.2d 310. This is where the Government failed to make out its case against Milam.

Shortly after the organizational period, Metropolitan moved out of Milam's office into offices of its own located in a separate building. Milam used some of the extra space in Metropolitan's new offices to store several old files and some furniture. This, and the fact that Metropolitan was an admitted client, account for Milam's presence from time to time in the offices of Metropolitan. In response to inquiry by Milam, one of his prior, part-time secretaries got in touch with Metropolitan. Milam did not hire her or pay her salary. Milam advised Kimball and Sprague as to the forms of the contract they used at Metropolitan. These contracts were ordinary and legal on their face—it was the method they used which created the fraud. Milam accompanied Kimball to New York on several occasions in an effort to secure from reputable business sources loans for Metropolitan's prospective customers. It is nowhere shown that Milam knew of, or engaged in, the underhanded practices of Metropolitan. Of course Milam helped organize Metropolitan and subsequently acted as its attorney. This was the extent of the Government's proof against him.

There are only two pieces of evidence which suggest any connection which Milam might have other than in legal work. One concerns the testimony of a victim who had issued his "advance fee" check, but received no loan. On the day the victim, seeking out Kimball, went to Metropolitan's offices to complain, no one was there. Milam showed up with a key to the office. According to Milam's testimony, he had gone to Metropolitan's office to get an old file he kept stored there and had found the victim. They entered Metropolitan's office. The victim showed Milam the cancelled check which had been endorsed by Kimball and deposited to the account of Metropolitan. The victim testified that Milam seemed very upset on learning that the money had not been received. The two of them spent almost the whole afternoon without success trying to run down and reach Kimball to find out why the advance fee check had been cashed before the loan was actually consummated.

The only other evidence was that two of the "advance fee" checks were deposited to an account held in the joint name of Milam and a client [2] who was then out of the country. Milam said this was an ordinary attorney's trust account in which he deposited clients' money and checks made payable jointly to Milam and some client. It is without contradiction that Milam had nothing to do with the endorsement and deposit of one of the checks. It was deposited to this joint account at a time when he was out of town. The endorsement on this check was made by Appenzeller, then the secretary of Metropolitan, who died prior to the trial. The other check was endorsed and deposited by Milam to this account. It was undisputed that he was on retainer for Metropolitan, and this was the method used by Metropolitan as payment on his retainer.

There is nothing save Milam's activities as a lawyer to connect him to this enterprise. The Government, of course,

---

had recently resigned as an officer of a corporation which he helped through the organizational period.

2. The account was in the name of "Mrs. [Ino Roe]* or Alton T. Milam, Atty."

---

* Fictitious name inserted by us.

had the burden of proving beyond a reasonable doubt that these activities, admittedly within the compass of those a lawyer legitimately could do, were done for some illegal purpose. He did legal work. For legal work he was entitled to get compensation. The receipt of money from Metropolitan was therefore not itself enough to turn the performance of legal work, drafting contracts, application forms, etc. into proof of participation in the fraudulent scheme. It took something more. Milam had nothing to do with the solicitation sales pitches, the representations or misrepresentations to potential customers. One check is not shown to have been deposited or its proceeds used by, or with his knowledge. As to the other check received as retainer, there was nothing to show that the loan for which the check was an advance fee had not been consummated. Except for the limited contact with one victim, there is no indication that he knew of the practice to cash the advance fees prior to making the loan. The circumstances of that incident on the Government's proof are not such as to permit the inference that what he then learned, he had known all along. What it shows without dispute is just the opposite.

■ The long and short of it is that we think the Government's proof relating to Milam is insufficient to support the conviction, and the trial Court should have granted Milam's motion for judgment of acquittal. F.R.Crim.P. 29(a). This want of evidence showing a crime also requires reversal as plain error, F.R. Crim.P. 52(b), despite the failure to renew the motion at the close of all the evidence. See Riggs v. United States, 5 Cir., 1960, 280 F.2d 949; and the 1963 proposed Amendments to F.R.Crim.P. 29(b).

■ As to the remaining Appellants, Kimball and Sprague, there can be no real question as to the sufficiency of the evidence to support the verdict. Although Sprague had very few personal contacts with the victims, he is so interwoven with the organization that the actions of anyone concerned therewith must be imputed to him. His name appeared in the letters sent to prospective victims. His name appeared on the contracts with the victims in his official capacity as executive vice-president. He and Kimball were the real moving parties in organizing and carrying on the operations of Metropolitan. Metropolitan operated out of the same offices where Sprague had previously conducted the business of Beneficial Business Loans Service Corporation. There is no conceivable way to segregate Sprague from the operations of Metropolitan.

To the jury Kimball could well have been treated as master mind and figure in the operation. He was the high-pressure salesman who interviewed victims, made big promises, accepted their checks, made trips to New York in an attempt to secure loans, promised victims loans up to $200,000 within a week, implied that Metropolitan was the lending arm of Metropolitan Life Insurance Company. The trial Judge properly overruled their motions for judgment of acquittal.

■ Kimball and Sprague urge here that the trial Judge erred in failing to sustain their motion to dismiss the indictment because (a) the indictment as a whole, or each count taken separately, failed to charge an offense in that it did not say the mailed matter contained false representations or requests for money or property, and (b) all but one of each type of mailing charged should have been dismissed since, under the statute, only one crime was committed by the use of the mails in furtherance of the scheme regardless of the number of mailings involved. The indictment, after setting out the names of the defendants in Count I, described in great detail the operation of Metropolitan, and in the same paragraph connected these defendants to Metropolitan. In subse-

quent counts, the indictment re-alleged all the facts in the first paragraph of Count I and then identified the mailing.[3]

■■ We think the indictment was sufficient. The gist of the offense charged under § 1341 is that the mails are used to further a fraudulent scheme or device. Once the fraudulent scheme is alleged and established, the only other requirement under the statute is that there be a use of the mails in furtherance of such scheme. Abbott v. United States, 5 Cir., 1956, 239 F.2d 310, 314; Marvin v. United States, 10 Cir., 1960, 279 F.2d 451; Palmer v. United States, 10 Cir., 1955, 229 F.2d 861, cert. denied, 1956, 350 U.S. 996, 76 S.Ct. 546, 100 L.Ed. 861; Webb v. United States, 10 Cir., 1951, 191 F.2d 512. The first count of the indictment here described that scheme in great detail. Each subsequent count realleged that scheme and then charged a specific instance in which the mails had been used in furtherance of the scheme. It is not necessary that the indictment allege that the mailed material contain false representations or that it contain requests for money or property as long as the indictment alleges and the proof subsequently shows that the mailings were an essential part of the scheme. Under a somewhat different attack, we recently upheld an indictment phrased in substantially the same language as the one involved here. Glenn v. United States, 5 Cir., 1962, 303 F.2d 536. This rule is not at variance with our earlier opinion of Getchell v. United States, 5 Cir., 1960, 282 F.2d 681. There the Court upheld the attack on the indictment because the mailed matter was "at most, 'merely incidental and collateral to the (alleged) scheme and not a part of it.' Kann v. United States, 1944, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88." 22 F.2d at 684. Here the mailings were the means by which Metropolitan solicited customers.

They were an "incident to an essential part" of the scheme and the indictment so charged. Pereira v. United States, 1954, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435. The Appellants are certainly not helped in this respect by Parr v. United States, 1960, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277; cf. United States v. Sampson, 1962, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136. The indictment conformed in all respects to the offense under the statute. Short of pleading evidence which is not required, we do not see how an indictment could possibly be more specific than the one involved here. The indictments adequately protected these defendants against any surprise from the proof presented by the Government.

■■ Neither do we think there is substantial merit in the Appellants' argument that the indictment (and subsequent conviction) was faulty because it charged a separate violation of the statute by each mailing. The Appellants urge here that this is pyramiding penalties and that all mailings under the one scheme are only one violation of the statute. In support of this thesis, they cite several recent cases. E. g., Prince v. United States, 1957, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370; Heflin v. United States, 1959, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407; Yates v. United States, 1957, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95; Gore v. United States, 1958, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405. None of these cases, and others cited by defendants, deal with the mail fraud statute. However persuasive we might find them were we construing the statute for the first time, in the climate of such recent decisions, the matter is no longer open. With but few slight modifications, the present statute has been in effect since 1872.[4] Its meaning is no longer ambiguous. It has been construed time and again by the Supreme Court

---

**3.** Each count in Paragraph 2 set forth substantially, "that, on or about [date] in [place], for the purpose of executing said scheme and artifice and attempting to do so, the defendants unlawfully, wilfully and knowingly placed in an authorized de-pository for mail matter an envelope and contents addressed to [victim], to be sent and delivered by the Post Office Department of the United States, in violation of Section 1341, Title 18, U.S.C.A."

**4.** Act of June 8, 1872, 17 Stat. 323.

and Courts of Appeals to mean that each separate use of the mails in the execution of the scheme to defraud constitutes a separate offense. E. g., Badders v. United States, 1916, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706; Durland v. United States, 1895, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709; In Re Henry, 1887, 123 U.S. 372, 8 S.Ct. 142, 31 L.Ed. 174; Marvin v. United States, 10 Cir., 1960, 279 F.2d 451; Palmer v. United States, 10 Cir., 1955, 229 F.2d 861, cert. denied, 1956, 350 U.S. 996, 76 S.Ct. 546, 100 L.Ed. 861; Stumbo v. United States, 6 Cir., 1937, 90 F.2d 828, cert. denied 302 U.S. 755, 58 S.Ct. 282, 82 L.Ed. 584. With these uniform holdings, if there is to be change it is for Congress, not us, to make it.

■■■■■ The next point urged here by Sprague and Kimball is that the trial Judge erred in refusing to grant them a severance. We have held many times that this is a matter within the sound discretion of the trial Judge, and his decision will not be overturned unless there is an affirmative showing of abuse of discretion. Dowling v. United States, 5 Cir., 1957, 249 F.2d 746; Corcoran v. United States, 5 Cir., 1956, 229 F.2d 295; Duke v. United States, 5 Cir., 1956, 233 F.2d 897; Raarup v. United States, 5 Cir., 1928, 23 F.2d 547. Sprague and Kimball have not shown here that it was an abuse of discretion for them to be tried together. Their crimes grew out of the same series of transactions. Providing the Government could prove the connection between Sprague and Kimball, the same evidence needed to convict one would serve to convict the other. It would have been admissible against each had each been tried separately. They claim, however, that to deny their motions for a severance was to deny each of them the right to have lead counsel in presenting his own case. We are unable to fathom this. At the trial, each defendant was represented by counsel of his own choice. Each counsel had an equal opportunity of objection and presentations of motions to the Court. There was unlimited right to cross-

examination of the Government's witnesses. In short, each counsel was given ample opportunity to present his client's case.

■■■■■ Throughout the trial, each of the defendants made several motions for mistrial. The overruling of these motions is assigned as error here. This was a heated trial and tempers often flared. Colloquy between Court and counsel came very close at time to reaching the breaking point. At one point, the Court admonished one counsel for bullying a witness on the threat of contempt. In view of the prior warnings by the Court, we do not feel that this admonition was prejudicial, inappropriate, or harmful. The Court, as requested by appellants, instructed the jury that if, as was sometimes necessary, the Court admonished an attorney who became over zealous for his cause, the jury should draw no inferences from an admonition of this nature. Likewise, we find no merit in the appellants' other objections as to the manner in which the Judge conducted the trial. It is true that the law demands that a Judge be imperturbable. However, he can only be an imperturbable human being. As long as men are judged by other men, we cannot expect, nor would we want, the presider to be a mere machine. Under the provocative circumstances of this case, we think the District Judge, with the remarkable patience displayed here, measured up to the ideal of a fair Judge conducting a fair trial.

■■■■■ To substantiate the claim of prejudice, these defendants claim error in overruling their motion for mistrial because of statements made by one juror to two other jurors during a recess in the trial. Kimball himself took the stand to testify in support of this motion that he had been in the rest room during the recess. While there he overheard one juror tell two other jurors that were he (a juror) a witness in this case he would sue the defense lawyer (clearly indicating which one) for all he was worth for the way he was harassing witnesses. The Judge refused to grant a mistrial,

but offered to excuse the juror who made the remark and substitute an alternate therefor if this would satisfy counsel. Counsel were not satisfied as they felt the whole jury might be prejudiced against the counsel for the defendants. At this point, the "offensive" counsel moved to be allowed to withdraw from the case. The Judge would not release him from the case, but did allow another attorney to take his .place, the "offensive" counsel remaining in the court room for consultative purposes. The Judge also discharged the juror who had made the remark during recess and substituted an alternate.

We think all this points to the fact that the Court was making every effort to afford the defendants a fair trial. We find no reason for overturning the ruling of the Judge who was present and witnessed firsthand the proceedings. The jurors had not talked about the case, they had expressed no feelings as to the outcome, and the two listening jurors had not replied to the remark. One juror made one remark about one defense counsel. The juror was discharged, the defense counsel resigned from the case, and the trial proceeded. We find no error.

 The only other point urged here that is of any consequence concerns the testimony of a Postal Inspector. He testified that he had answered an advertisement for a salesman. He called the advertised telephone number, talked to Sprague and went to the offices of the company posing as a book salesman. In this guise, the Postal Inspector talked to Sprague about the job. Sprague (who was then manager of Beneficial Business Loan Service Corporation) explained the "sales pitch." He told the Postal Inspector how to evade answering searching questions, how to get the contract signed, and how to get the certified "advance fee" check and get out of town.

The Appellants objected to this testimony, and subsequently moved for a mistrial because it had been admitted. We think this was possibly the most spectacular single piece of evidence in the whole trial. The Postal Inspector's testimony opened the trial and prepared the jury's mind for what was to come. It was more effective than any opening statement the Government attorney could have possibly made. Had the Government not connected Beneficial with Metropolitan, we think the admission of this testimony would have been clear ground for reversal. The trial Judge recognized this and admonished the jury that they should not consider it unless there was sufficient tie between Beneficial and Metropolitan.

We think the Government has shown the necessary connection. Sprague was manager of Beneficial—he was later executive vice-president of Metropolitan. Kimball was a salesman for Beneficial—he was later president of Metropolitan. Appenzeller (now deceased) was a salesman for Beneficial—he was later secretary of Metropolitan. After its organization, Metropolitan moved into the same offices previously vacated by Beneficial. The method of operation of Metropolitan was substantially the same as Beneficial, both being "advance fee" organizations. The financial service agreement used by Metropolitan was very similar to that used by Beneficial. In fact, one of Metropolitan's forms was so well copied from a Beneficial form that Beneficial's name appeared on it. To cap it all off, some of the leads sent to prospective customers by Beneficial were subsequently answered by salesmen of Metropolitan. We think the connection between Metropolitan and Beneficial is amply shown.

In view of the Judge's instructions and charge to the jury (to which the appellants did not except), we think it was not error to admit the Postal Inspector's testimony. The Court charged on circumstantial evidence, aiding and abetting, the proof necessary to show a plan or scheme and that a particular defendant was a member of such scheme, and that the jury was to consider the evi-

dence separately as to each defendant, leaving out entirely any evidence admitted solely against some other defendant or defendants.

Appellants have urged numerous reasons why we should reverse the conviction because of alleged errors in the admission of documents, refusal to strike certain testimony, error in the Court's charge. We have found no error in the Judge's rulings on the admission of exhibits, nor on the motions to strike testimony. As to the Court's charge to the jury, none of the defendants objected at any time to it. We think the charge was substantially in conformity with the law, and if there were any errors they were not of the kind to warrant a reversal as plain error under F.R.Crim.P. 52(b).

The judgment of conviction as to Appellant Milam is reversed and remanded to the District Court with instructions to enter a judgment of acquittal. The judgments of conviction as to Appellants Kimball and Sprague are affirmed.

Affirmed in part and reversed in part.

JOHNSON, District Judge (dissenting).

I can and do concur in that part of the opinion of the majority which affirms the convictions of Appellants Sprague and Kimball. I cannot, however, concur as to the reversal of the conviction of Appellant Milam.

In my opinion, the evidence presented to the Government on the trial of this case was just as strong to support the conviction of Milam as it was to support the convictions of Sprague and Kimball. The opinion of the majority minimizes the evidence that directly connected Milam with this scheme, and, in doing so, violence is done to the basic legal proposition that the issues of fact are to be decided by the jury under proper instructions from the Court. Milam's part in this entire operation and his knowledge of the criminal activities of the operation are manifested by his incorporation of the Metropolitan Investment Service Corporation and his acting as secretary and treasurer of that corporation until he reorganized it and "turned" it over to Sprague and Kimball. Milam also hired a typist to work at the investment corporation. He drew the contract that was used by the salesmen of the corporation. The Dixon check that had a restrictive endorsement on it to the effect that it was not to be cashed until the loan was granted was in the amount of $1,190 and was deposited to the account of Milam. In addition to this, Mr. Dixon testified that upon several occasions he complained to Milam about his loan not going through, and tried to get his money back, but was assured by Milam that the loan would be forthcoming. Also, a check in the amount of $225 from a refrigeration company was deposited to Milam's account. One of the victims, a Mr. Dawson, testified that he complained about delays with respect to his loan. Upon one occasion Dawson testified that in Milam's presence Kimball assured him that the Metropolitan Investment Service Corporation was a branch or subsidiary of Metropolitan Life Insurance Company and suggested that if he did not believe it, he could verify it by the home office of Metropolitan Life Insurance Company in New York. Subsequently, Mr. Dawson spoke with Milam who assured him that his loan had been approved and stated that he could not understand why Dawson had not received the loan long ago. Such false representations were the basis for the entire scheme and firmly connected Milam with the scheme.

I dissent as to the reversal of the conviction of Milam.