Leon **ADJMI**, J. & C. A. Corporation and Joseph Adjmi, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 21584.

United States Court of Appeals
Fifth Circuit.
June 10, 1965.

---

See also 5 Cir., 343 F.2d 164.

Jacob Kossman, Philadelphia, Pa., for appellants.

Arnold D. Levine, Sp. Asst. U. S. Atty., Tampa, Fla., Edward F. Boardman, U. S. Atty., for appellee.

Before TUTTLE, Chief Judge, BELL, Circuit Judge, and DYER, District Judge.

DYER, District Judge:

The appellants were convicted under a four-count Indictment for violations of the mail fraud statute, Title 18, U.S.C. § 1341, and for conspiracy to violate said statute, Title 18 U.S.C. § 371.

Count One alleged that the appellants devised a scheme to defraud twelve named insurance companies by falsely stating the actual cash value of the property on hand in a shop operated by the appellant, J. & C. A. Corporation, on March 21, 1958, was $300,393.49, and, as a result of a fire on that date on the corporation's premises, suffered loss and damage in the amount of $193,989.10; and thereafter, deposited a resultant claim of loss in the mails on May 10, 1958, addressed to the General Adjustment Bureau.

Counts Two and Three repeated the same allegations in respect of a mailing to two different insurance companies on June 5, 1958.

Count Four charged the individual appellants with conspiracy, in violation of 18 U.S.C. § 371, alleging that they conspired together to devise a scheme to obtain money and property by means of the false pretenses set forth in the substantive counts and to violate 18 U.S.C. § 1341 by so doing.

Three specifications of error are urged.

First, it was error to refuse to charge the jury that, if the aggregate of the losses claimed and paid represented the fair value of the damage suffered, the fact that erroneous invoices reflected an inventory figure that was higher than the loss actually claimed was immaterial.

Second, the trial judge's preliminary statement to all of the jurors, that he would punish them if they disregarded his instructions not to read newspapers covering the trial, prevented a fair poll of the jury when prejudicial newspaper articles about the case actually appeared during the trial.

Finally, the court erred in denying the defendants' requests for specific instructions on credibility.

I

The appellant's theory was that if, not withstanding marked-up invoices, the total sums paid them by the insurance companies were no more than the aggregate of their losses, they had not committed a fraud. The defendants' requested instructions consistent with this theory were refused.

Whether the requested instructions should have been given is dependent upon whether there was any foundation in the evidence or basis in law that would support the theory of defense.

Following the fire, representatives of the insurance companies, together with a public adjuster representing the insured, prepared a verified inventory which was presented as the claim of loss and damage of the insured. The cost value of the merchandise was based upon invoices submitted by appellants except for certain items (1) which were stated to have been purchased for cash and (2) some which appellant, Leon Adjmi, refused to produce because he did not want to reveal the source of purchase that allowed him low prices. Based upon this inventory, the loss resulting from the fire was adjusted.

Of the total loss reflected in the verified inventory, including furniture, the sum of $266,403.72 represented stock, and the asserted loss to stock was $197,041.06. The amount paid resulting from the conferences and settlement negotiations of $193,898.10 was some $44,540.44 less than the asserted total loss of $238,438.54.

One invoice for $16,915.00 showing a sale to the Adjmis prior to the fire was prepared at the request of Leon Adjmi by the alleged seller after the fire. It was

not entered on the seller's books; it included items that he did not carry, and the figures on some items amounted to ten times the cost to the J. & C. A. Corporation.

After the fire an accountant was requested to prepare for submission to the insurance companies a list of unpaid bills of the corporation. Included in these was the sum of $84,400.00 allegedly owed by the corporation to Leon Adjmi for merchandise purchased from him, but the corporate books did not reflect such an obligation, nor did the books of Leon Adjmi reflect this as an obligation due to him. For income tax purposes, this alleged sale was completely disregarded. The items purportedly making up this obligation to Leon Adjmi were included in the documents submitted to the insurance companies and were ultimately shown to be the same linens in regard to which Leon Adjmi refused to reveal the source, because he had purchased them at such a bargain.

The Adjmis obtained from another seller an invoice for the alleged purchase of approximately $25,000.00 worth of merchandise (although the invoice was used merely as an order form) and later wrote the seller that they desired to keep the merchandise that had been shipped on this invoice. This merchandise was neither shipped nor paid for by the appellants, although this invoice was submitted by them to establish the cost of the items therein contained.

Other evidence tended to show costs on items in the invoices submitted to the insurance companies to be many times the actual cost of such merchandise.

Upon this state of the record, the appellants say that if the water in the original total was squeezed out in the course of the settlement process so that the smaller amount submitted to the companies through the mail and paid by them was equal to the actual loss, no one was defrauded.

The evidence does not support this assertion, but, more important, the argument stems from a false premise.

The figures submitted to show cost prices of merchandise (inflated in some instances 4 to 10 times) were not honest mistakes, nor is there any explanation of the fictitious invoices. Appellants, at least for the sake of argument, concede this but simply say no one was defrauded because the companies did not lose any money. This does not follow. To the contrary, the settlement figure was arrived at through assessing the amount of damage to the goods based upon the inventory submitted by the appellants, not through discounting the values submitted because of false invoices.

Smith v. United States, 230 F.2d 935, 6 Cir., 1956; United States v. Park Motors, 107 F.Supp. 168, D.C.E.D.Tenn., 1952, and United States v. Beaty Chevrolet Co., 116 F.Supp. 810, D.C.E.D.Tenn. 1953, relied upon by appellants are readily distinguishable. The defendants in Smith had been told by bank officials that it was proper to include in their application for FHA loans a purpose, other than what was actually so, for which the proceeds of the loans were to be applied. The Court held it was error not to instruct on this factor as negativing fraudulent intent. Nothing in this case remotely resembles this situation.

In Park Motors and Beaty Chevrolet, car dealers were involved who submitted bills to the government for automobiles sold to veterans. The bills correctly stated the amount due from the government, but falsely stated the price of the automobiles. In Park Motors, the dealer acted on the advice of a government official; in Beaty Chevrolet, there was an error of judgment by a company employee. These cases simply hold that no fraudulent intent was proved.

Assuming arguendo that the insurance companies did not lose any money, it is of no moment for, as we said in Kreuter v. United States, 218 F.2d 532, 5 Cir., 1955, Section 1341 may be violated regardless of whether the fraudulent scheme is successful. The elements of the offense are simply (1) a scheme to defraud and (2) use of the mails to effect this scheme. United

States v. Shavin, 287 F.2d 647, 90 A.L. R.2d 888, 7 Cir. 1961. The fictitious invoices and inflated cost of items in the inventory were plainly sufficient to show a scheme and intent to defraud and the use of the mails was conceded.

■■ A charge must be adjusted to the facts of a particular case, Sims v. Texas and New Orleans R. R. Co., 267 F.2d 37, 5 Cir., 1959. There was no factual basis for the charges requested by the appellants and their theory of defense had no basis in law; thus the failure to give them was not error.

## II

The appellants were not unknown in Miami, Florida, previous indictments having been returned against them. Thus, upon the motion of the appellants for a change of venue from the United States District Court for the Southern District of Florida, Miami Division, the cause was transferred to Orlando, Florida, to insure a fair and impartial trial. Subsequently, the Middle District of Florida was created and, upon motion of the appellants, the indictment was transferred for trial to the Tampa Division of the Middle District of Florida.

During the course of the trial, the newspapers in Tampa, Florida, printed news accounts which contained inadmissible facts prejudicial to the appellants. They complain that, when this occurred, the Court not only made an inadequate inquiry of the jurors, but, because of the cautionary preliminary instruction to the effect that failure to observe the court's admonitions not to read newspaper accounts pertaining to the trial might subject the jurors to punishment by the court, the inquiry was effectively stifled.

To properly assess this specification of error, it is necessary to consider the breadth of the instructions given by the court so that the language appellants object to in the preliminary cautionary instructions and the asserted inadequacy of the inquiry during the trial may be considered in context.

At the outset, the court, after fully explaining to the jury the function of an Indictment, the presumption of innocence of appellants, and the burden of proof cast upon the government, said:

" * * * in this country we have freedom of the press. That freedom also involves free television and free radio. I am sorry to say that those are rights denied to many people. But it is also fundamental that a defendant in a criminal trial is entitled to a fair trial. A fair trial requires that his guilt or innocence be determined in open court with testimony given under oath.

"It sometimes happens that newspapers, television and radio stations have information about the case which has not been presented in open court and which would not be admissible, if presented. The defendants in this case have the absolute right to have their guilt or innocence determined by you upon evidence presented in open court.

"In order that you may not be influenced in your deliberations by anything not presented in open court you are directed not to read any newspaper accounts pertaining to the trial, or listen to television or radio broadcasts pertaining to the trial or to allow any person to discuss such accounts with you. Jurors are held to regard the instructions and admonitions given by the Court in connection with the case. The failure of a juror to observe such instructions and admonitions and requests may be subject to punishment by the Court. During my twenty-five years service in the trial courts I have never had to punish a juror for misconduct. There is no reason to anticipate any reason to do so in this case."

The Court went on to say that the jurors were not to communicate with the Court, the lawyers, the defendants or witnesses, and then said:

"In the six weeks I have been here there has been practically nothing in the papers about Federal Court

procedures. Sometimes we never knew when the newspapers are going to consider something particularly newsworthy. Heretofore, they have not, but if they should, that is why I am taking this precaution. Sometimes a so-called mail fraud case attracts attention.

"I want first to ask all the jurors here and out there this question: is there any member of this panel who has read some news account about the charges against the defendants here? If you have, will you raise your hands? I won't take your names now but I want to ask you another question before I go further; is there any member of those who held up their hands who has formed an opinion as to what they have read, or what they have heard, as to the guilt or innocence of these defendants? If so, would you indicate by holding up your hands?

"Is there any member of this jury panel who, if selected as one of the jurors in this case, would require evidence to remove from your mind any thought or recollection of what you have read or heard from any newspaper or news account in this matter? In other words, is there any member of this panel who would carry into the jury box any recollection which in your own mind would require you to have evidence before you to remove that recollection?

"Will those who first held up their hands raise their hands? We will bring that up later.

"Is there any member of the panel who feels that they cannot go into this jury box with an open mind, a receptive mind, ready to listen to and be guided solely by the evidence and the instructions of the Court? Is there any member of the panel who feels they cannot go into the trial of this lawsuit and be guided solely by the evidence and the instructions and not as to anything they have heard about the case?

"The record may show that as to the last two questions nobody raised their hands."

"Ladies and gentlemen of the jury: throughout this trial it is the duty of each and every member of the jury not to converse and communicate among yourselves, or with anyone on any subject about the case in any way. If anyone attempts to talk to you about the case, or in your presence, you must tell that person that you are a juror in the case and you are not at liberty to discuss it. If he or she persists, call them before the Court.

"It is also your duty to keep your minds free and open and not permit any opinions to be formed by you until you have heard all the evidence in the case. You should observe these instructions at all times, whether they are especially called to your attention or not."

█ When during the course of the trial counsel for the appellants brought to the court's attention the prejudicial newspaper accounts and moved for a mistrial, the court had a duty to inquire whether the articles had created prejudice in the minds of the jurors. Marson v. United States, 203 F.2d 904, 6 Cir., 1953. The jury was returned to the courtroom and the following took place:

"THE COURT: Ladies and gentlemen of the jury, may I have your attention? I want to ask you a question. Have any of you since the commencement of this trial read any of the newspaper accounts about the trial?

"A JUROR: I saw only the headlines and did not read the articles.

"ANOTHER JUROR: I saw that.

"ANOTHER JUROR: I read it a second and then I quit.

"THE COURT: You quit reading the moment you saw it related to the trial."

"THE JUROR: Absolutely.

"THE COURT: And nothing about that would affect you in any way. I think that answers what I wanted to know. I say again, we have a free press and we also have the right of fair trial and sometimes it is hard to keep the lines clear. But the defendants have a right to have their guilt or innocence passed upon without any newspaper accounts.

"All right, Mr. Levine."

■ We are of the firm view that, under the circumstances then prevailing, the inquiry made by the court was adequate. Not only had the jurors not read the accounts, but the little the three jurors observed concerning the articles would not have had an effect on them in any way. United States v. Carlucci, 288 F.2d 691, 3 Cir., 1961, cert. den., 366 U.S. 961, 81 S.Ct. 1920, 6 L.Ed.2d 1253.

■ It would serve no useful purpose to attempt to analyze the many cases that have considered this question, for as the court said in Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, "each (case) must turn on its special facts."

Appellants say that it is asking too much of human nature to expect a juror to admit doing a forbidden act where such admission bids fair to invoke punishment; and thus, the earlier admonition had the effect of stifling the inquiry during trial. It must be borne in mind that the court was familiar with the prior publicity given the case—the reason for the transfer from Miami to Orlando, thence Tampa. We think that the trial judge "was extreme'y sensitive to the problems raised by adverse newspaper publicity," United States v. Bentvena, 319 F.2d 916, 2 Cir., 1963 and was thus aware of the necessity "that trial courts call attention of jurors specifically to the possibility of such newspaper accounts and to admonish jurors not to read them." Coppedge v. United States, 106 U.S.App.D.C. 275, 272 F.2d 504, 1959.

If the appellants' argument had merit, no case with substantial public interest would survive a motion for a mistrial, for if the court failed to clearly admonish the jurors at the beginning of the trial, they could hardly be blamed for later reading a newspaper about the proceedings. On the other hand, if we must assume that the mild yet direct admonition here given would cause jurors to perjure themselves, then there is no escape from the dilemma.

What actually took place at this trial refutes the appellants' argument. The inquiry having been made by the court, three jurors, in spite of the "threat of punishment", held up their hands and candid'y told the court what they had seen.

■ We agree that "Appellate Courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct," Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439.

■ We find no error in the court's refusal to grant the appellants' motion for a mistrial.

### III

One Karpis, a government witness who gave testimony damaging to the appellants, admitted at the trial that he had made prior false and inconsistent statements to postal inspectors. Appellants' requested instructions to the effect, that the testimony of Karpis be carefully scrutinized, and if the jury believed that any witness testified falsely concerning a material matter, it had a right to reject all of the testimony of that witness. The court refused, and instead gave the usual general charge on credibility. The appellants specify the court's refusal as reversible error under this Court's ruling in Coleman v. United States, 167 F.2d 837, 5 Cir., 1948.

■ Coleman, however, does not stand for the proposition that a special instruction on credibility must invariably be given if requested by a defendant. It

is only when the evidence tends to show that a witness has exhibited *bias or prejudice against the defendant* that a special instruction should be given "as a matter of protection to the defendants."

As we later pointed out in Pereira v. United States, 202 F.2d 830, 5 Cir., 1953, where the defrauded victim apparently exhibited no venom, ill will or hatred, she was not *per se* a biased or prejudiced witness. We held under such circumstances that a general credibility charge was sufficient, and that a charge on the assumed bias or prejudice of the victim was not required.

Here there was no showing of any ill will on the part of the witness Karpis, and there was no error, therefore, in giving the general and refusing the requested charges.

This case was fully and fairly tried to a jury. The errors specified are without merit. The judgment is affirmed.