Roy E. GUSOW, Appellant,

v.

UNITED STATES of America,
Appellee.

Melvin L. SHAPIRO, Appellant,

v.

UNITED STATES of America,
Appellee.

Donald H. ORANSKY, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 7668–7670.

United States Court of Appeals
Tenth Circuit.

June 25, 1965.

V. G. Seavy, Jr., Denver, Colo. (Anthony F. Zarlengo and Richard A. Zarlengo, Denver, Colo., on the brief), for appellants Roy E. Gusow and Melvin L. Shapiro.

O. John Rogge, New York City (Leslie A. Gross, Denver, Colo., on the brief), for appellant Donald H. Oransky.

Milton C. Branch, Asst. U. S. Atty., Denver, Colo. (Lawrence M. Henry, U. S. Atty., Denver, Colo., on the brief), for appellee.

Before PICKETT and BREITENSTEIN, Circuit Judges, and CHRISTENSEN, District Judge.

PICKETT, Circuit Judge.

The appellants, Gusow, Shapiro and Oransky, were jointly indicted, tried and convicted on eight counts of using the mails to defraud, in violation of 18 U.S. C. § 1341. The sole issue raised on this appeal is whether the appellants were entitled to a judgment of acquittal for lack of substantial evidence to show either a scheme or the requisite intent to defraud.

The crime of mail fraud is broad in its scope, and may ordinarily be shown by proof of the intentional devising of a scheme to defraud and that the mail was used in furtherance of the scheme.[1] Linden v. United States, 4 Cir., 254 F.2d 560; Deschenes v. United States, 10 Cir., 224 F.2d 688; United States v. Baren, 2 Cir., 305 F.2d 527. The scheme is one to defraud if it is reasonably calculated to deceive persons of ordinary prudence and comprehension. Silverman v. United States, 5 Cir., 213 F.2d 405, cert. denied 348 U.S. 828, 75 S.Ct. 46, 99 L.Ed. 653; United States v. Baren, supra. Direct proof of willful intent is not necessary. It may be inferred from the activities of the parties involved. Henderson v. United States, 6 Cir., 202 F.2d 400. Not only are the patently false statements prohibited, but also those made with a reckless indifference as to whether they are true or false. Babson v. United States, 9 Cir., 330 F.2d 662, cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1045; West v. United States, 10 Cir., 68 F.2d 96. Similarly, the deceitful concealment of material facts may also constitute actual fraud. Cacy v. United States, 9 Cir., 298 F.2d 227. Moreover, the deception need not be premised upon the verbalized words alone. The arrangement of the words, or the circumstances in which they are used may convey the false and deceptive appearance. Linden v. United States, supra.

This prosecution grew out of the activities of the appellants in soliciting applications from persons interested in foreign or overseas employment, primarily in the construction trades. The usual course of operation by the appellants, doing business in Denver, Colorado as "Overseas Application Services", (O.A. S.) began with the insertion of an advertisement in a newspaper of general circulation, indicating that applications of qualified men and women would be accepted or prepared for employment overseas.[2] The advertisements each stated times and dates when and where interviews would be conducted in the area.[3] The interviews were handled and applications taken by the appellants personally and by their "salesmen" in either

---

1. The use of the mails in connection with the activities of the appellants is admitted.

2. The advertisements, which the court considered to be patently deceptive, appeared with only slight variation in the following manner:

   "MEN and WOMEN ages 18 to 50 who want applications prepared for OVERSEAS JOBS. Applications are now being prepared for men and women who feel they can qualify for the following: Welders, Pilots, Co-Pilots, Airline Mechanics, Truck Drivers, Dragline Opr., Construction Men, Bulldozer Opr., Semi-skilled Workers, Many Others; Typists, Stenographers, Warehousemen, Airport Employees, Plumbers, Skilled Workers, Electricians, Accountants, Bookkeepers, Secretaries.

   Interviews Friday, Sept. 15 5:00 p.m. only. Sat. and Sun. Sept. 16 & 17 9 a.m. to 9 p.m. only. KENTWOOD ARMS, 700 St. Louis St. Springfield, Mo.

   If you are skilled or semi-skilled and in good health, there are top-paying job opportunities to $1500 monthly with little or no taxes, adventure and excellent living conditions. Contact our O.A.S. representative at the above address."

3. Advertisements were placed in newspapers and interviews and applications were conducted in such cities as Pueblo, Colorado; Wichita, Kansas; Springfield, Missouri; and Kansas City, Missouri. The activities in any of these cities was from two to four days.

a hotel or motel suite rented for that purpose. When completed, the applications were sent to the O.A.S. Denver office where copies were prepared and mailed to ten companies purportedly engaged in or contemplating overseas projects. For this an applicant was charged a total of $22.50, or $2.25 per application.[4]

When an applicant appeared at the place designated for the interview, he was first handed a copy of a two-page "General Information on Overseas Jobs" bulletin to read. This information sheet contained generalized statements regarding the policies of the companies doing work overseas, and working conditions. It also contained numerous references to pay and monetary rewards of working overseas.[5] After reading and returning the information sheet, the applicant, if he so desired, would be given an "application" form to be filled out, following which he would then be interviewed by one of their "salesmen." The application form is complete on one side of a letter-size page. It does not indicate that it is an application of O.A.S., and it seeks only the most rudimentary personal information. The 10 copies when typed at Denver for mailing to the companies, of course could not be signed by the applicant.

The major portion of the "interview" appears to have been devoted to obtaining the applicant's signature upon a document referred to as a "contract." The contract was on a page separate from the application, and purported to set forth the whole agreement between O.A.S. and the applicant. The contract carries the heading "Overseas Application Services", followed by a Denver post office box address, and date space. Next following are three spaces in which the applicant listed in order his preference of the areas of the world in which he desired employment. The body of the agreement sets forth the undertakings of the parties, and provides for the reproduction and distribution of the applications by O.A.S. and recites the obligation of the applicant to pay. Other statements contained in the body of the agreement may be characterized as ex-

---

4. The evidence indicates that the charge initially was $17.50 and was later raised to $22.50.

5. The "General Information" sheet contained, among other things, the following statements:

"Overseas wages generally run anywhere from 45% to 75% higher than comparable wages in the United States. In addition to this, there is always overtime, and sometimes an extra cost-of-living allowance. On most overseas jobs, the cost of living is much cheaper than in America." * * *

"By and large, the basic attraction of working outside of the Continental Limits of the United States lies in the fact that the financial rewards are much higher, plus the fact that the American dollar in foreign lands has a fabulous buying power when converted into foreign money." * * *

"For instance, in France, if you are working for the U. S. Government and making, say, a low wage of about $6,500 annually (including various government allowances), you are able to live extremely well and save money besides. The reason for this is obvious when you consider that, even in Paris, you can buy an excellent meal with the rate of exchange between the French Franc and the American dollar. * * * Some of the overseas installations for men are in comparatively remote areas, but, nevertheless, it is strictly up to the individual's desire whether he saves money or not. As an instance, there is a particular case I know of, where two men drawing exactly the same salary on a civil service project in Trinidad, after about two years, had entirely different bank accounts. One man, who went nowhere for entertainment the entire two years, saved about $14,000; the other man cavorted, had a wild time, and still managed to save about $8,000 after two years. * * * We endeavor to categorize various jobs, and the locations of same in such a way as to facilitate every applicant's chance of being hired for the job and location he or she is seeking. * * * So you see—whether you are a ditch digger or a doctor—you have a chance Now for BIG MONEY! EXCITEMENT! ADVENTURE!"

culpatory in nature.[6] It concludes with spaces for the signature of the "Authorized Representative of O.A.S." and the applicant. Directly under the space for the applicant's signature is the statement: "I understand that I am not obligated to accept any employment which might arise through the efforts of O.A.S." It was also stated in the contract, and each applicant was told, that they would receive from O.A.S. a list of ten companies to which the application was sent. It appears that there were four basic lists of companies, and that the applications were sent to the companies listed on one of the four. There was no proof that O.A.S. did not duplicate or send the number of applications it represented would be sent.

The applicants who were called as witnesses for the government testified, in substance, that they were led to believe that it was O.A.S. which was hiring; that O.A.S. was representing directly the companies which were hiring; that probabilities of getting jobs were good; that salaries were exceptionally good; that income would be non-taxable; and that other applicants had been placed. Most applicants also indicated that they were told at the interview by the O.A.S. representative that they had good qualifications and that they would no doubt be hearing from the companies soon.[7]

6. The following statements are taken from the contract:
"1. I understand that all statements made on my application are true to the best of my knowledge."
"2. I understand that O.A.S. is not an employment agency and this is not a guarantee of a job, or offer of employment."
"4. I understand that after O.A.S. completes the above agreement, that all future correspondence will be between me and the companies to whom my applications have been submitted."
"I certify that there have been no verbal promises or agreements other than those appearing above."
"I certify that I have thoroughly read this agreement and understand the contents fully and acknowledge receipt of an exact copy of this agreement."

7. The witness Hazen testified on direct examination as follows:
"Q. Now, Mrs. Hazen, at the time that you had this conversation with the salesman, was the application form that you filled out in the room? A. Yes, he had it and looked at it and said that we were both well qualified because secretaries or stenographic work was always required on such a job and that my husband's application was good and there would be no question about it. Then, his company, with offices in Denver, had been established for a number of years and had contacts with overseas companies, not necessarily overseas companies, but companies that were doing work overseas and hired people. His company had contacts with them and knew who was needed, where, and in this they would send our applications to ten different companies and at that time he couldn't tell us just which companies because the office had the information in Denver of which companies would be in need of the type of work that we did, but our application would go to them and that we would hear from the companies and then, from then on, our dealings would be with the company."
And, on cross-examination, as follows:
"Q. So you knew you weren't going to hear from OAS after they had sent you the list of the 10 companies and mailed your applications out? A. I didn't expect to hear from OAS. I expected to hear from the companies my applications had been sent to."
The witness Brooks testified that in his conversation with the appellant Oransky he was told:
"He told me that they were American companies, overseas, that had Government contracts and that this OAS was a kind of a, they were in contact with these companies."
The witness Miller also testified as to his conversation with Oransky:
"Q. (Mr. Branch) Now, would you relate to the Court and jury what transpired in this interview that you had with the defendant Oranski? A. Well, he said that my application qualified and that I had, that this was hiring a lot of people about this time of year and that likely I would get a job and then he said that he would, for a fee, that he'd send my applications to 10 different companies and that I'd be hearing from the companies soon and not to be in any hurry about picking one, I wouldn't have to be in a hurry about going, I'd have plenty of time to take care of

Representatives of the companies to which the applications were sent testified without significant variation that all of the applications were received by them on the same day, or over a very short period of time; that there was nothing to indicate they came from O.A.S. and that there was no return address; that the applications could not be used by the company; that they used no mail application company and could not use the services of such a company; that they never heard of O.A.S.; that they hired only supervisory personnel or highly-trained technicians to send overseas, and never common tradesmen, semi-skilled or skilled labor; that no one was hired or even considered for a job on the basis of these applications; and nearly all stated that all of these applications were thrown away, many without being opened. The representative of one company stated that at the time the applications were received the company was not hiring for overseas work and that, in fact, most of its work was domestic.

The appellants each testified in his own behalf regarding the manner of operation and their good intent in conducting the operation. Oransky said the applicants were told that there was a demand for workers because he felt it was true. However, he also stated that O.A.S. had no information from any of the companies regarding the necessary qualifications for employment by them. He stated that O.A.S. had no direct contact with any of the companies and that their list, which was made up by excerpting the names of companies from trade publications, was the only connection. He stated that if he felt an applicant was qualified, he would be told

that he might be hearing from the companies, and that he should not accept the first job offer. Oransky said that he never told any applicant that O.A.S. had no direct contact with the companies.

Shapiro testified that none of the companies were ever contacted to determine the authenticity of the periodical listings in the trade publications from which the O.A.S. list was made up. Gusow also stated that the companies did not even know of the existence of O.A.S., but that none of the applicants were ever so informed.

Two fundamental rules of appellate review need only be mentioned here in passing. First, the evidence must be considered in the light most favorable to the government, and secondly, the verdict of the jury will not be set aside if supported by substantial evidence. These basic propositions and the test of review for sufficiency of the evidence are fully considered in Cartwright v. United States, 10 Cir., 335 F.2d 919, and cases cited therein.

The gist of appellants' position here is that they organized a legitimate business and acted in good faith in their dealings with those who desired to use their services; that each applicant received exactly what he bargained for, and that there was no intent to defraud. In Beck v. United States, 10 Cir., 305 F.2d 595, 598, cert. denied 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123, the court said:

"Fraud or the existence of a fraudulent scheme is seldom susceptible to proof solely by direct evidence and in nearly every such

things and that's about all. Q. Now, was there anything—any discussion concerning salaries? A. Yes, he said I'd make as much as three times what I am making now, up to $1,000 a month, he said."
And, on cross-examination, testified as follows:
"Q. Did you think that you were at the office of a company that was employing people for overseas construction

work? A. No, I was under the impression that I was at a company that was hiring for construction companies to go overseas. Q. You were under the impression that Overseas Application Service itself was hiring persons for other companies that were doing work overseas? A. No, I was under the impression that they were taking applications for other companies and the other companies would do the hiring."

case, direct and circumstantial evidence together with the inferences to be drawn therefrom must be relied upon for proof. On the face of the business operation involved here, it may be argued that it was merely a legitimate business venture that did not work out successfully. That, however, was a question of fact, to be determined by the jury after considering all of the evidence and the inferences to be drawn therefrom."

Considering the record as a whole, the foregoing statement is appropriate for this case.

Affirmed.