Howard A. BLACHLY and Robert L. McMillen, Appellants,

v.

UNITED STATES of America, Appellee.

No. 23574.

United States Court of Appeals Fifth Circuit.

July 11, 1967.

John Sheldon Toomer, Lake Charles, La., James W. Schwing, New Iberia, La., for appellants.

E. V. Boagni, Asst. U. S. Atty., Edward L. Shaheen, U. S. Atty., Shreveport, La., for appellee.

Before BROWN, MOORE,* and BELL, Circuit Judges.

* Of the Second Circuit, sitting by designation.

JOHN R. BROWN, Circuit Judge:

These are appeals from convictions by a jury of 18 counts of mail fraud, 18 U.S.C.A. § 1341.[1] The original indictment charged Blachly, McMillen and Hockensmith[2] with use of the mails to effect sales of water softeners under a fraudulent referral selling plan to various persons in the area of Morgan City, Louisiana. Hockensmith pleaded guilty. Blachly, charged as a direct principal, was convicted on 17 counts of mail fraud and sentenced to 3 years' imprisonment on one count, sentencing on the remaining counts suspended with 5 years' supervised probation. McMillen, in 2 counts charged in effect as an aider and abettor, 18 U.S.C.A. § 2(a),[3] was convicted on only one count and sentenced to one year imprisonment. Both appeal.

Substantively, Blachly questions whether the mechanics of the referral selling plan here involved constitutes a mail fraud within the meaning of § 1341, specifically whether any intent to defraud was shown. He denies the requisite causal connection between use of the mails and carrying out the scheme. Various procedural errors are also urged. McMillen's asserted errors relate to the District Court's actions in denying his motion for severance, for acquittal following the close of the Government's case, and for new trial after the verdict of guilty had been rendered. We find all of these contentions without merit and affirm.

The nature of the offense here involved and the questions presented make it necessary to set out in some detail the factual background of the alleged scheme to defraud and its method of execution. We do this in the light of what the jury could, and from the verdict of guilty presumably did, infer.

The events which form the basis for the indictment occurred in and around Morgan City, Louisiana, between February or March and October of 1964. Blachly operating under the trade name of Pioneer Products or Pioneer Marketing, Inc., employed McMillen and Hockensmith as salesmen to assist him in selling water softeners under a "Referral Selling Plan" (Plan). The jury could assume, in the face of a silent record, that the Plan was originally set in motion by using some method to select potential purchasers who were then contacted by telephone to arrange an appointment for a demonstration of the product. The key was this "potential purchaser." But the moment the Plan worked, he was no longer a "potential" purchaser. By then he had bought. From that point on, the mechanics of the Plan rendered the scheme self-perpetuating, and a steady flow—indeed, an overflow—of further customers was assured.[4]

1. "Frauds and swindles
"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, * * * for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter * * * to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon * * * shall be fined not more than $1,000 or imprisoned not more than five years, or both."

2. During the Louisiana operations, John S. Hockensmith was working under the alias of John K. Lockridge, apparently, for the purpose of tax evasion.

3. "Principals
"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

4. The terminology can get complicated with a system which is self-perpetuating. The "potential purchaser" is the initial contact. The "prospective customers" are "referred parties," i. e., those whose names were furnished by the initial "po-

Ordinarily the appointments with these potential purchasers were arranged for evenings so that both husband and wife could be present. At that time a demonstration of the product was given by means of a miniature model of the water softener, and the advantages of using the treated, demineralized water in the home were explained. At the conclusion of the demonstration the parties who expressed an interest were then informed of the mechanics of the Plan. They were told that as a result of a promotional advertising plan of the manufacturer, the family—i. e., the potential purchaser—could not only acquire the water softener at no cost to themselves but also would have the opportunity to earn a profit. This was possible, it was said, since, under the Plan, each sale thereafter made to a prospective customer whose name had been supplied by the potential purchaser would entitle such purchaser to a referral sales commission of $40. No limit was placed on the number of referred parties that the purchaser could give. The right to an additional $40 sales commission also extended to secondary sales, i. e., each sale to a third level customer whose name had been given by the prospective customers of the potential purchaser (see note 4, supra, 6, infra).

At this point, two steps remained to effectuate the Plan. First, the sale had to be consummated by the execution of three instruments. The first was the Commission Agreement, the existence of which was recognized and acknowledged by all the witnesses. It set out the cash sales price, including tax, of $610,[5] and provided for payment in 36 monthly installments of $23.04, a total of $829.44 as a time price. Also included were provisions for sales commissions on referrals.[6] The agreement was to be signed by the husband and wife and witnessed by the salesman.

In this first step two other instruments had to be signed by the husband and wife. One was a promissory note, the other a real estate mortgage. The note was for the amount of the installment time price, $829.44, and was witnessed by two persons and notarized.[7] While some of the purchasers testified that they knowingly executed the note, the majority disclaimed such knowledge. Their story was that it was represented to them that their signatures on the other papers were merely for purposes of record keeping or for obtaining credit references.

The mortgage was a real estate mortgage on the purchaser's home, and contained a clause waiving any homestead rights that might exist under Louisiana law. The instrument was signed in blank, and later filled in with the description of the mortgaged property, witnessed, and notarized (but in the absence of the mortgagors). The purchasers uniformly testified that at no time had they known, or for that matter had it been represented to them, that they were

---

tential purchaser." The moment a "prospective customer" was contacted he became a "potential purchaser" from whom names of second level "prospective customers" was sought. And so on until the millennium.

5. The purchaser would have been able to pay cash, but this was not the usual practice.

6. "3. Pioneer Products shall pay the sum of Forty Dollars ($40.00) for each name submitted by .................. providing the name submitted results in a sale. Payments will be made within fifteen (15) days after acceptance of

the prospective purchaser by Pioneer Products.

"4. Pioneer Products shall pay Representative as earned commission the sum of Forty Dollars ($40.00) for each name subsequently submitted by the individuals referred to in paragraph 3 at the time they too become an equipment owning representative with Pioneer Products."

7. The purchasers testified generally that neither the named witnesses to the notes nor the notary were present at the time the instruments were signed. In some cases the salesman had signed as a witness.

executing a real estate mortgage on their home to secure the note.[8]

The second step was to obtain the names of further prospective customers. This was an essential, integral part of every transaction, and was quite involved itself. The potential purchaser was furnished a number of duplicated letters [9] written in nice, readable handwriting which referred to "an advertising program that has increased both our family's income and standard of living," and advising the recipient that he would be contacted to arrange an appointment. It was represented as a "wonderful opportunity * * * to earn some extra money" and that "no cash investment" was required. The predrafted letters required only the insertion of the name—personalized of course —of the reference and the signature of the purchaser. The potential purchaser was urged to add a brief postscript to the letter adhering to the same general theme, the representation being that this would increase the possibility of a successful sale and hence their commissions. Along with the letter, the potential purchaser was requested to fill in a "memo slip" which besides the name of the purchaser contained the name of the specified referred party, his address, telephone and occupation.[10] The letter, completed with postscript (if any), and memo slip were then inserted in an enve-lope addressed to the referred party. But the envelope was left unsealed. The letters were not to be mailed by the potential purchaser, but were either picked up by one of the salesmen or mailed in a large envelope to the office of Pioneer Products in Morgan City.[11]

It bears emphasis that no limit was placed on the number of referred parties whose names could be furnished by the potential purchaser. The potential purchaser was admonished, however, that should any of the referred parties attempt to make a direct contact (as, e. g., a telephone call) regarding the "program" mentioned in the letter,· they should explain nothing but rather leave this to the salesman. This, it was implied, if not expressed, would give a better chance of consummating a sale. At the office of Pioneer Products, the memo slips were removed and filed, the names of referred parties presumably checked to minimize duplications, and the selected envelopes sealed and mailed. The mailing of the letter was followed up shortly by a telephone call by Blachly or one of the salesmen to arrange an appointment to demonstrate the water softener and present the Plan. The circle was complete. But more so, if it worked again the circle was repeated. And so on and on and on.

8. Several did testify, however, that they either assumed or were told by the salesman that the instrument was a chattel mortgage on the machine itself.

9. The boilerplate read:
   "Recently we entered into an advertising program that has increased both our familys' income and standard of living. We are sharing our fortune with a few of our friends and immediately thought of you.
   "The program is of such an unusual nature that I cannot begin to explain it. So we have asked the representative who called on us to give you folks a call and arrange an appointment with you.
   "We think you'll appreciate the time you take in listening, for it is a wonderful opportunity for you to earn some extra money and enjoy a better way of life. Best of all there is no cash investment required. So do as we did and allow him a few minutes of your time and let us know what you think of the program.
   "Our Best Regards,"

10. This apparently was a control device, designed to assure that none of the referred parties in the area received more than one of the letters, else their commission obligations would multiply and also suspicion might arise. This—as we shortly point out—was a valid concern. Despite these precautions several witnesses testified that they had received more than one letter.

11. Undoubtedly this was for control purpose to avoid, or minimize, duplications (see note 10, supra).

The promissory notes were discounted to a third-party finance company [12] without recourse. The mortgages were completed and placed of record. Some of the purchasers received commissions as a result of referral sales. But the most received by any one of them was $200 —not even enough to cover the interest and carrying charges of the installment sale. Most received nothing.

As his activities bear upon challenges here made, it is appropriate to point out that the postal investigation was under the direction of Inspector L. W. Robertson, a specialist in mail fraud cases. Inspector Robertson's preliminary investigation included backtracking the public records which disclosed the recorded mortgages in favor of the finance company.

In subsequent interviews with many of the purchasers, he gathered most of the documentary evidence that was introduced at the trial. His preliminary investigation also included an interview with Blachly at his office in Morgan City on October 1, 1964.

### I.

### Blachly's Appeal

At this late date no need exists to more than capsulate severely the elements of an offense under the mail fraud statute, 18 U.S.C.A. § 1341. They are (1) the forming of a scheme to defraud and (2) use of the mails for the purpose of executing the scheme. Pereira v. United States, 1953, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435, 444; Adjmi v. United States, 5 Cir., 1965, 346 F.2d 654, 657; Milam v. United States, 5 Cir., 1963, 322 F.2d 104, 109, cert. denied sub nom. Kimball v. United States, 377 U.S. 911, 84 S.Ct. 1174, 12 L.Ed.2d 181; Gregory v. United States, 5 Cir., 1958, 253 F.2d 104, 109; Kreuter v. United States, 5 Cir., 1955, 218 F.2d 532, 533, cert. denied, 349 U.S. 932, 75 S.Ct. 777, 99 L.Ed. 1262; Gusow v. United States, 10 Cir., 1965, 347 F.2d 755, 756;

Silverman v. United States, 5 Cir., 1954, 213 F.2d 405. If these elements are satisfied, more is not required. Gregory v. United States, supra.

Blachly strongly urges that the referral selling plan here in question is not a "scheme" within the statutory proscription, and that it has not been shown that any specific intent to defraud existed. The crime of mail fraud is board in scope. Gusow v. United States, supra, 347 F.2d at 756; Deaver v. United States, 1946, 81 U.S.App.D.C. 148, 155 F.2d 740, 744. The fraudulent aspect of the scheme to "defraud" is measured by a nontechnical standard. Gregory v. United States, supra, 253 F. 2d at 109. Law puts its imprimatur on the accepted moral standards and condemns conduct which fails to match the "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." Ibid. This is indeed broad. For as Judge Holmes once observed, "[t]he law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity." Weiss v. United States, 5 Cir., 1941, 122 F.2d 675, 681, cert. denied 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550; Abbott v. United States, 5 Cir., 239 F.2d 310 at 314. All that is necessary is that it be a "scheme reasonably calculated to deceive persons of ordinary prudence and comprehension." Silverman v. United States, supra; Gusow v. United States, supra.

Applying there precepts to the mechanics and method of execution of the Plan, we have no doubts that the first requirement—a scheme to defraud—has been satisfied. This is so for two readily identifiable reasons. First, the Plan, as conceived by the parties and represented to the purchasers, could not possibly work. Second, the execution of the Plan was accomplished by the most base form of deceit—a misrepresentation of the true nature of the obligation being assumed by the purchaser.

12. All State Credit Plan, in Morgan City.

■ With regard to the Plan, representations, both oral and written, were made to prospective purchasers, that the water softener could be acquired by them with "no cash investment," that through commissions that would be earned by the purchaser as a result of the unlimited referral sales, both original and secondary, it would "pay for itself" and perhaps make an additional profit. This was a key inducement to the purchaser to submit as many referred names as possible since in theory at least, this would increase his referral commission earnings to achieve the maximum return. Yet only in theory is the scheme the least bit sound. Its operation could achieve success only in a theoretical unlimited universe. The mail fraud statute—and inescapably Judges, Tomlinson v. 1661 Corp., 5 Cir., 1967, 377 F.2d 291, 300 —must deal with the practicalities of the outside business and social world. As a practical matter, the inherent and patent impossibility of such a plan working is plain.[13] Its impossibility is manifested by the amazing letter-spread potential achieved with each successive step in the referral sequence. The number of references spiral in a geometric progression [14] so that, as pointed out by the Government, "In a small city such as Morgan City, in which the defendants operated, not to mention the smaller towns and villages, the saturation point of prospective purchasers of the water softeners would quickly be reached. Relatively few sales of the water softeners would be made and few commissions would indeed be earned by the victims of the scheme." [15]

■ In a nutshell, the vice of this referral scheme was twofold. The first was the strong representation, most frequently expressed and always implied, that from the referral commissions the purchaser would not have to pay for the machine being bought and might even make a profit. The second was the demonstrable impossibility of the first being achieved.[16] Referral selling schemes like this have been uniformly condemned by the Courts.[17] Contrary

---

13. This, of course, could be no defense for even "the monumental credulity of the victim is no shield for the accused." Deaver v. United States, 1946, 81 U.S. App.D.C. 148, 155 F.2d 740, 745.

14. The illustrative calculations set forth in the Government's brief are not challenged.
   "By way of a simple illustration, if the first fifteen recipients of the opening wedge, that is, the initial letter in turn each sent out or mailed fifteen letters the number of such letters put in circulation would reach 225. On the second step, the number increases to 3,375, and on the fifth step to the somewhat astounding total of 11,390,625. * * * The mathematical certainty that the 'referral' plan of merchandising is inevitably doomed to failure is obvious." To this the Government adds by way of argument, "Such is the natural vice and structure of quicksand found present in all 'endless chain' transactions."
   From an analysis of the record, the Government's use of 15 as the base seems ultra conservative. Some purchasers provided as many as 100 references, the majority around 50 or 60.

15. The 1960 population of Morgan City, Louisiana, is 13,540. Even including the whole of St. Mary Parish, in which Morgan City is located, the population is only 48,833. U.S. Bureau of the Census, County and City Data Book, 1962 (Statistical Abstract Supp.).

16. Referral selling in which customers are given inducements to enlist patronage by friends may be, and frequently is, quite legitimate. We do not condemn them by this decision. Ample protection to accepted business practices, including high pressure sales campaigns and techniques, is afforded through the law's definition of fraud, the necessity that fraud be found by the jury beyond a reasonable doubt plus—perhaps the most important— the determination by both trial and appellate court whether the particular format offends the law.

17. In a very similar case involving the referral selling of stereo sets, the 8th Circuit had this to say:
   "The referral plan cannot succeed even if used for only a short time unless at some point customers subsequent to the first one are not allowed to earn the set. As the Government brought

---

to Blachly's assertions, whether any of the victims of the scheme suffered a material loss is immaterial, for success of the scheme is not essential to completion of the offense. Gregory v. United States, supra, 253 F.2d at 109; Kreuter v. United States, 5 Cir., 218 F.2d 532 at 535; Adjmi v. United States, supra, 346 F.2d at 657. Thus, although the burden is on the Government to establish the essential elements of the offense, Kreuter v. United States, supra, this does not entail or require proving that the victims of the scheme were actually defrauded or that they suffered damage or pecuniary loss. Hermansen v. United States, 5 Cir., 1956, 230 F.2d 173.

Besides the inherent impossibility of the Plan, the method used in its execution also serves to condemn this scheme and bring it within the statutory prohibition. The record amply supports the implied jury conclusion that the representations made in consummating the sale were designed to delude the purchaser regarding the nature of the obligations assumed. Very few purchasers knew or were informed that they were executing a promissory note for the balance of the installment contract price, and not one realized that he had executed as security for the debt a real estate mortgage on his home which also had the incidental but necessary effect of waiving all homestead rights under Louisiana law. All testified that had this been known, the purchase would not have been made. The fraud condemned by the statute is not limited to active misrepresentation. Indeed a scheme may be fraudulent even though no affirmative misrepresentation of fact be made, Kreuter v. United States, su-

out at the trial, once the plan is set in motion, the referrals spiral due to the principle of geometric progression. If each person who purchases a set can earn it by referring names, no profit will be made; hence, no funds would be available to satisfy referral commitments. The only method of halting the progression is to withhold the referral privilege for customers who were obtained by referral."

Fabian v. United States, 8 Cir., 1966, 358 F.2d 187, 194 no. 6. See also Zebelman v. United States, 10 Cir., 1964, 339 F.2d 484, where a referral selling plan quite similar to those involved in *Fabian* and here was held to violate the mail lottery statute, 18 U.S.C.A. § 1302.

Without intimating our approval or disapproval of them, we point out that the Government's brief also cites four other recent unreported cases where convictions under the mail fraud statute were sustained for allegedly similar referral selling schemes, United States v. Paul T. Van Winkle and John Brunquardt, US DC WD Mo. 1965; United States v. Brown Alexander Mangum and James Ted Griffin, USDC WD N.Car., 1965; United States v. Arthur Rue Steiger et al., USDC WD Okl., 1965; and United States v. Richard Hatfield Nickles and Leonard Luke, USDC Utah, 1966.

Presumably on the ground that this is a reflection of the community's determination of acceptable conduct—a factor inescapably involved in the law's definition of a fraudulent scheme—the Government cites the Annual Report of the Postmaster General for the fiscal year ending June 30, 1966. In taking note of it, we intimate no holding concerning its legal significance:

"*Chain referral.* This is one of the most widespread fraudulent schemes flourishing throughout the country today. It is often identified as 'Referral Selling.' Prospective 'customers' generally receive a note from a friend or acquaintance advising them of a promising moneymaking plan.

"Almost without exception, promoters grossly inflate the normal selling price of the product, which may range from automobiles to central vacuum cleaning systems; claim the item will not cost anything since referral commissions will allegedly more than pay for it; represent that purchase contracts are completed simply to show good faith and to authorize installations; and make other equally false and fraudulent representations.

"Not until victims have already signed conditional sales contracts do they realize that they have actually obligated themselves to pay for a product which often they neither want nor can afford. The much-promised referral commissions rarely materialize."

So close is it to the pattern proved here, this description might have served as a guideline for the scheme here involved.

pra; Gregory v. United States, supra. The deceitful concealment of material facts may also constitute actual fraud. Gusow v. United States, supra, 347 F.2d at 756; Cacy v. United States, 9 Cir., 1961, 298 F.2d 227, 229. This then is but another circumstance which the jury could consider in arriving at a determination of whether the scheme as a whole was fraudulent within the statutory meaning.

Blachly's assertion that there was no causal connection between the use of the mails and effectuation of the scheme is patently frivolous. The statutory requirement is satisfied if use of the mails is an "incident to an essential part" of the scheme, Pereira v. United States, supra, and if use of the mails should have been reasonably contemplated, Adams v. United States, 5 Cir., 1963, 312 F.2d 137; Hart v. United States, 5 Cir., 1940, 112 F.2d 128; Everitt v. United States, 5 Cir., 1962, 306 F.2d 839. Here the mailing of the pre-drafted personalized letters to the referred parties was part and parcel of the scheme. Its deceptive, alluring appeal of big profits rested on the mailing of more and more letters. That is enough. Brown v. United States, 5 Cir., 1964, 328 F.2d 652, 654. And either personally or through his fellow participants, Blachly was sufficiently tied into the use of the mails. Sherwood v. United States, 5 Cir., 300 F.2d 603 at 605; Steiner v. United States, 5 Cir., 1943, 134 F.2d 931, 934.

Blachly's remaining contentions are meritless.[18] He fails to make out any denial of his constitutional rights because of the investigative activities of Inspector Robertson. Robertson's interview with Blachly in October 1964 was during the investigatory stage and prior to his determination that sufficient evidence of mail fraud existed to conclude that a crime had been committed. Cf. Myricks v. United States, 5 Cir., 1967, 370 F.2d 901, 905. Robertson made no attempt to conceal his identity or the purpose of his interview, cf. Milam v. United States, supra, 322 F.2d 104, 111–112, and advised Blachly that he had a right to counsel and need say nothing. There is no violation of Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. Miranda v. State of Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, is inapplicable. Johnson v. State of New Jersey, 1966, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. Contrary to Blachly's assertions, the documentary exhibits gathered by Robertson were not obtained from Blachly but rather from the defrauded purchasers interviewed by Robertson. Consequently, the exclusionary rule of *Mapp* can have no application. Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

## II.

### McMillen's Appeal

(a) Motion for Severance

It is now well established that the grant or denial of severance is a matter within the sound discretion of the trial Judge, and his decision will not be

---

18. Blachly's assertion that the testimony of Hockensmith was "prejudicial in that it showed nothing more than guilt by association" fails since the testimony of Hockensmith, an accomplice, was clearly competent and admissible in a criminal prosecution against Blachly. Peters v. United States, 5 Cir., 1967, 376 F.2d 839 [Apr. 10, 1967]. And the trial Court was careful to charge the jury regarding the weight and credibility that should be accorded the testimony of an accomplice.

Nor is there anything to his claim that the "best evidence" rule was violated by supra, 322 F.2d at 111; Dowling v. allowing the introduction of copies of the promissory notes involved in some counts of the indictment rather than the promissory note itself. Application of the "best evidence' rule in these circumstances could find no justification in the policy underlying that rule. See McCormick, Evidence § 197 (1954). The notes were only collaterally involved and were introduced, not for proof of their exact terms, but rather only to show the method by which the scheme was effected. McCormick, supra, § 200 at 412–413.

overturned unless there is an affirmative showing of abuse of discretion.[19]

■■ Here, the trial Judge was careful clearly to admonish the jurors that they were to consider only the record evidence relating to the actions of the particular defendant being considered. That the jurors understood this instruction is manifested, we think, by the fact that, although McMillen was charged in the indictment with two distinct and separate counts of aiding and abetting Blachly in committing the substantive offense, he was found guilty on only one of the counts. The connection between Blachly and McMillen was adequately established by the testimony of the accomplice Hockensmith. It was reinforced by the admissions made by the confederate Blachly to Inspector Robertson. Both parties were represented by their own retained, independent counsel. The trial Court's action met the standards.[20] We can find no abuse of discretion. Everitt v. United States, 5 Cir., 1960, 281 F.2d 429, relied upon by McMillen does not compel a contrary result.

(b) Motion for Acquittal and for New Trial

■■■ In considering the motion for judgment of acquittal, F.R.Crim.P. 29 (a), the District Judge must consider the evidence in the light most favorable to the Government, McFarland v. United States, 5 Cir., 1960, 273 F.2d 417; United States v. Carter, 6 Cir., 1963, 311 F.2d 934, together with all inferences which may reasonably be drawn from the facts,

Cartwright v. United States, 10 Cir., 1964, 335 F.2d 919. The determining inquiry is whether there is substantial evidence upon which a jury might reasonably base a finding that the accused is guilty beyond a reasonable doubt.

■ An examination of the record reveals that competent, credible testimony was introduced which established the working relationship of McMillen with Blachly, McMillen's knowledge of the scheme and his active participation in presenting it to potential purchasers. The testimony of the accomplice Hockensmith categorically identified McMillen as one of the salesmen employed by Blachly in the Morgan City operation, and equally established McMillen's knowledge of the method of sales presentation of the Plan. Again this was reinforced by Inspector Robertson's testimony that Blachly stated McMillen was employed by him as a salesman in Franklin, Louisiana, a short distance from Morgan City. The promissory note of one of the purchasers bore McMillen's signature as one of the witnesses, although he had not been present at the sale. Most important, the testimony of the Comeaux's—the victims named in the count of which McMillen was convicted —clearly identified and established McMillen as the salesman who had presented the mechanics of the Plan to them and effected a sale. The method of presentation of the scheme closely paralled that testified to by the other purchasers. In sum, the record evidence of McMillen's knowing and active participation in the scheme was more than suffi-

19. Peterson v. United States, 5 Cir., 1965, 344 F.2d 419; Milam v. United States, United States, 5 Cir., 1957, 249 F.2d 746; Corcoran v. United States, 5 Cir., 1956, 229 F.2d 295; Duke v. United States, 5 Cir., 1956, 233 F.2d 897; Schaffer v. United States, 1955, 5 Cir., 221 F.2d 17; Raarup v. United States, 5 Cir., 1928, 23 F.2d 547; and see F.R.Crim.P. 8.

20. In United States v. Kahaner, S.D.N.Y., 1962, 203 F.Supp. 78, 81–82, Judge Weinfeld articulated the test which we approved in Peterson v. United States, supra, 344 F.2d at 422, in these terms:

"[W]hether, under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted."

cient to withstand the motion for acquittal.

 McMillen strongly urges that the evidence is insufficient to show that he acted with any intent to defraud. In particular, he points to the testimony of the Comeaux's, the only witnesses in the trial to whom he had made a sale and from which formed the basis for the only count on which he was convicted. The record shows that McMillen informed them that they were executing a promissory note and further that they were "completely satisfied with McMillen's sale." This, of course, ignores two things. The first is their equally explicit testimony that at no time was it made known to them that they were executing a real estate mortgage with homestead waiver to secure the note.[21] Second, as we earlier pointed out, that they were satisfied with the sale is no defense, for success of the scheme is immaterial to the offense charged and the pattern here was the visionary referral scheme of astronomic profits. Of course, direct proof of willful intent to defraud is not necessary. It may be inferred from the activities of the parties involved. Gusow v. United States, supra; Henderson v. United States, 6 Cir., 1953, 202 F.2d 400. Based upon the record evidence before the Court, we think it was clearly a jury question whether there was a scheme to defraud and whether each defendant was a party to it.[22]

Under applicable standards so well known to all, we find no error in the trial Court's denial of the motion for new trial which raised substantially these same matters.

Affirmed.

---

21. Contrary to McMillen's assertions, we think it immaterial that the Government failed to show who filled in the blank mortgages and had them placed of record. Once the requisite signatures were acquired, the scheme was substantially effected. This likewise disposes of Blachly's contention that he should not have been convicted in the count where the mortgage description had been filled in erroneously.

22. Shushan v. United States, 5 Cir., 117 F. 2d 110, at 121; Silverman v. United States, supra, 213 F.2d at 405.

The language of the Tenth Circuit in *Gusow* fits well here:

"The gist of appellants' position here is that they organized a legitimate business and acted in good faith in their dealings with those who desired to use their services; that each applicant received exactly what he bargained for, and that there was no intent to defraud. In Beck v. United States, 10 Cir., 305 F.2d 595, 598, cert. denied 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed. 2d 123, the court said:

"'Fraud or the existence of a fraudulent scheme is seldom susceptible to proof solely by direct evidence and in nearly every such case, direct and circumstantial evidence together with the inferences to be drawn therefrom must be relied upon for proof. On the face of the business operation involved here, it may be argued that it was merely a legitimate business venture that did not work out successfully. That, however, was a question of fact, to be determined by the jury after considering all of the evidence and the inferences to be drawn therefrom.'"

347 F.2d at 759–760.